[No. B182346. Second Dist., Div. Six. July 18, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ISABEL CELIS, Defendant and Appellant.

COUNSEL

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**YEGAN, Acting P. J.**—Isabel Celis appeals from the judgment entered following her conviction by a jury of the first degree murder of Norma Barto. (Pen. Code, §§ 187, subd. (a), 189.)[1] The jury found two allegations to be *not* true: a lying-in-wait special-circumstances allegation (§ 190.2, subd. (a)(15)) and an allegation that appellant had personally used a deadly or dangerous weapon. (§ 12022, subd. (b).) She was sentenced to prison for 25 years to life.

Appellant contends that the trial court erred in failing to instruct the jury sua sponte on when a murder is complete, on the defense of mistake of fact, and on proximate cause. Appellant also contends that the trial court erroneously excluded evidence that would have supported the credibility of a defense witness. We affirm.

*Facts*

The body of Norma Barto was discovered at a dump site on December 2, 2003. Barto had severe head injuries. A 65-pound concrete block with blood on it was found about a foot away from her head.

Dr. Fred Walker performed an autopsy. He found 19 scalp lacerations. Most of the lacerations were consistent with blows from "a rod-like structure," a thin pipe, or a tire iron. He opined that certain injuries to Barto's face

---

[1] All statutory references are to the Penal Code.

were "very consistent" with an impact from the concrete block found next to her head. One of these injuries—the fracture of the bone around the orbit of her eye—"clearly" occurred while Barto was still alive. Dr. Walker reached this conclusion because "there was bruising in the undersurface of the brain immediately in contact with the fractured roof of the orbit, and that's not something that happens with an injury that occurs after death."

On December 3, 2003, appellant met with Pedro Arroyo. Appellant told Arroyo that Barto had come to her house to collect money that she had loaned to appellant. Appellant and Barto argued over the debt. During the argument, appellant shoved Barto. Barto fell, hit her head on a rock, and "started to bleed profusely." Appellant wrapped Barto's body in blankets and brought the body into the house. She and her son, Miguel Celis (Miguel), put the body and the rock into a car. That night, Miguel drove the car to an undisclosed location, where he disposed of the body. Arroyo notified the police of what appellant had told him.

On December 4, 2003, the police interrogated appellant while she was in custody at the police station. Appellant said that, during an argument over money, she had pushed Barto. Barto fell and hit her head on the side of a door or on a rock. She started to bleed a lot. While Barto was on the ground, appellant hit her two or three times with a piece of metal. She did not hit Barto in the face. Appellant summoned Miguel, and they both put Barto's body in the trunk of his car. Appellant thought that Barto was dead. Miguel drove away and did not tell appellant where he was going with the body. Appellant did not know what, if anything, Miguel had done to the body after driving away. Appellant never saw Miguel hit Barto.

The following day, the police continued their interrogation of appellant. Appellant said that, when Barto fell, she thought that Barto "had fallen down dead." But later appellant said, "I don't know if she already was dead."

### Appellant's Trial Testimony

Appellant testified and denied striking Barto with anything. Appellant said that, while arguing with Barto in the kitchen of appellant's house, Barto threatened her with a tire iron. Miguel came from the living room and threw Barto to the ground. He wrestled with Barto while trying to take the tire iron from her. Appellant saw Miguel hit Barto about three times.

Miguel told appellant "to get out of the kitchen." Appellant "wanted to pull him away from there so he wouldn't continue hitting" Barto, but Miguel "threatened" her. Appellant left the kitchen.

"A long time later," appellant returned to the kitchen. No one was there. Miguel was outside. He "was going to take the car out." The kitchen floor had been cleaned. Appellant did not see Barto, and did not know "if she was dead or alive." Miguel told appellant that he had put Barto in the trunk of his car. He did not say where he was going to take the body. Although there was no blood on the kitchen floor, appellant swept and mopped the floor "to clean it better." She lied to the police about her involvement in the incident because she wanted to protect her son. She also lied to Pedro Arroyo.

### Miguel's Trial Testimony

Miguel testified and told the jury that he had pleaded guilty to the first degree murder of Barto and had admitted a lying-in-wait special-circumstances allegation. He had not yet been sentenced. He said that he had not seen appellant strike Barto. He had lied to the police by telling them that appellant had killed Barto and that he had done nothing. He had falsely "blamed everything on [appellant]" because he "didn't want to go to jail."

According to Miguel, he heard appellant and Barto arguing in the kitchen. He ran to the kitchen, where he saw Barto holding a metal rod and threatening to hurt appellant. Miguel pushed Barto to the floor and started hitting her. Appellant grabbed Miguel to try to stop him from hitting Barto. Miguel turned around and "told her very angrily that [he] didn't want to see her because all of this was happening because of her." Appellant left the kitchen, and Miguel continued to hit Barto until he thought she was dead. Miguel put Barto's body in the trunk of his car. He cleaned up Barto's blood with water and towels. Miguel drove with a friend, Xavier, to an area where he dumped the body. While there, he picked up a concrete stone and threw it at the body.

### "Completeness" of a Murder and Aiding and Abetting

■ Because the jury found *not* true the allegation that appellant had personally used a deadly or dangerous weapon, appellant contends that it may have found that she was only guilty on an aiding and abetting theory.[2] "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the

---

[2] It is also possible that the jury believed that appellant did repeatedly beat the victim with a tire iron and, out of leniency, only found her guilty of the substantive charge. Jury determinations are not always consistent but it is clear that one determination cannot be used to impeach another. (*People v. Amick* (1942) 20 Cal.2d 247, 252 [125 P.2d 25]; *People v. Lopez* (1982) 131 Cal.App.3d 565, 571 [182 Cal.Rptr. 563].)

commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) An aider and abettor is chargeable as a principal. (*People v. Sully* (1991) 53 Cal.3d 1195, 1227 [283 Cal.Rptr. 144, 812 P.2d 163].)

The trial court instructed the jury that a person "who aids and abets . . . after the crime is complete" is "not a principal but is an accessory after the fact and has not committed the crime . . . ." Section 32 defines "accessory" as a "person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof . . . ."

Appellant contends that the trial court erred by failing to instruct the jury sua sponte that "a murder is complete when the fatal blow is struck, even if the victim lingers for a substantial period of time . . . ." Without this instruction, appellant asserts, the jury could have erroneously found her guilty of murder as an aider and abettor based on her conduct (i.e., cleaning the kitchen floor) after Miguel had delivered the fatal blow in the kitchen, but before Barto died. The instruction allegedly was necessary to "prevent the jury from relying upon the period of time between the fatal blow and actual death."[3]

█ The trial court did not err by "failing" to sua sponte so instruct the jury. The crime of murder is defined as "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Because the victim's death is a sine qua non of murder, the crime could not have been "completed" until Barto had died. "[A] murder ends with the death of the victim." (*People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1397 [34 Cal.Rptr.2d 324].)

Several out-of-state cases have held that, because a murder is not complete until the victim dies, a person cannot be convicted as an accessory after the fact to murder based on acts committed after the fatal blow was struck but

---

[3] Appellant claims, as a given fact, that the fatal blow was administered by Miguel in the kitchen. This is at variance with reasonable inferences to be drawn from the testimony of Dr. Walker and Miguel. Dr. Walker testified that (1) Barto was still alive when the bone around the orbit of her eye was fractured, and (2) this fracture was "very consistent" with an impact from the bloody 65-pound concrete block found near her head at the dump site. Miguel testified that, after dumping Barto's body, he had thrown the concrete stone at the body. Based on the testimony of Dr. Walker and Miguel, the jury could have reasonably inferred that the fatal blow was delivered at the dump site when Barto's head was struck by the 65-pound concrete block. Nevertheless, for the purpose of considering appellant's argument, we will assume that the fatal blow was struck in the kitchen.

before the victim died. (See *State v. Chism* (La. 1983) 436 So.2d 464, 468 ["[a] person cannot be convicted as an accessory after the fact to a murder because of aid given after the murderer's acts but before the victim's death, but under these circumstances the aider may be found to be an accessory after the fact to the felonious assault"]; *State v. Williams* (1948) 229 N.C. 348, 349 [49 S.E.2d 617, 618] ["a person cannot be convicted as an accessory after the fact to a murder because he aided the murderer to escape, when the aid was rendered after the mortal wound was given, but before death ensued, as a murder is not complete until the death results"]; *Baker v. State* (1947) 184 Tenn. 503, 507 [201 S.W.2d 667, 668–669] [" 'To fix the guilt of one who is charged as accessory after the act, it is essential that the homicide be complete by the occurrence of death. Until such time, any aid or assistance rendered to a party in order to enable him to escape the consequences of his crime, will not make the person affording such assistance guilty as an accessory after the fact.' "]; *Harrel v. State* (1861) 39 Miss. 702, 704–705 [2 Morr.St.Cas. 1472] [where defendant assisted murderer's escape after he had inflicted mortal wound on victim but before victim died, defendant not guilty as accessory after the fact to murder because murder not complete until victim died].)

In *Little v. United States* (D.C. 1998) 709 A.2d 708, the issue was "whether the trial judge correctly ruled that [the defendant] could properly be convicted of being an accessory after the fact to murder where both decedents were dying, but not yet dead, at the time [the defendant] rendered assistance to the murderer." (*Id.*, at p. 709.) The appellate court concluded that the trial judge had erred, and it reversed the defendant's conviction. The appellate court noted that, under the traditional common law rule, the defendant "could not have been successfully prosecuted as an accessory after the fact to a murder if the decedent was alive at the time [the defendant] provided . . . assistance." (*Id.*, at p. 712, fn. omitted.) The appellate court reduced the defendant's conviction to the lesser included offense of accessory after the fact to assault with a dangerous weapon. The court observed that, unlike the murder, the assault had been completed before the victims died. (*Id.*, at pp. 714–715.) In a concurring opinion, Associate Judge Terry wrote: "I specifically agree with the central holding in the case: that in order to convict someone as an accessory after the fact of murder, the government must prove that the victim died before the defendant committed the acts that make him an accessory after the fact. Since the crime of murder is not complete until the victim dies, no one can be an accessory after the fact of murder until that death occurs." (*Id.*, at p. 716 (conc. opn. of Terry, J.).)

Appellant nevertheless asserts: "The proposition that a murder is complete when the fatal blow is struck, even if the victim lingers for a substantial period of time, traces back 150 years to People v. Gill (1856) 6 Cal. 637, 638, and is repeated in People v. Harper (1945) 25 Cal.2d 862, 875 [156 P.2d

249]; and most recently in <u>People v. Superior Court (Quinteros)</u> (1993) 13 Cal.App.4th 12, at 21 [16 Cal.Rptr.2d 462]." Appellant misconstrues these cases.

In *People v. Gill, supra*, 6 Cal. 637, the defendant was convicted of second degree murder. But when the fatal blow was struck, there was no such crime. At that time, the defendant could have been convicted only of murder or manslaughter. After the fatal blow was struck but before the victim died, a statute was enacted dividing murder into degrees. Our Supreme Court held: "The death must be made to relate back to the unlawful act which occasioned it, and as the party died in consequence of wounds received on a particular day, the day on which the act was committed, and not the one on which the result of the act was determined, is the day on which the murder is properly to be charged." (*Id.*, at p. 638.) The Supreme Court reversed the judgment and directed the trial court to retry the defendant for murder. Thus, *Gill* merely stands for the proposition that "the death of the victim in a murder case relates back to the unlawful act which occasioned it, and that ordinarily the law in effect at that time is controlling. [Citation.]" (*People v. Snipe* (1972) 25 Cal.App.3d 742, 745 [102 Cal.Rptr. 6].)

In *People v. Harper, supra,* 25 Cal.2d at page 875, our Supreme Court stated "that the conspirator . . . is, in the eyes of the law, as guilty of the murder as if he had been present at the time the fatal blows were struck." The court never considered the issue of when the murder was completed.

In *People v. Superior Court (Quinteros), supra*, 13 Cal.App.4th 12, there was evidence that the defendant had been knocked unconscious during a fight. The court concluded that the defendant was criminally liable for the acts of his coconspirators, "whether or not he was conscious at the time that the fatal blows were struck to the head of [the victim]." (*Id.*, at p. 21.) As in *Harper*, the court did not consider the issue of when the murder of the victim was completed.

■ Appellant's reliance on the language of CALJIC No. 8.27, i.e., "the accused and killer must have been jointly engaged in the commission of the [felony] at the time the fatal blow was struck," is misplaced. This instruction concerns the felony-murder rule and an accomplice who, after the fatal blow, aids in the commission of the underlying felony. Such an accomplice is not subject to murder liability under the felony-murder rule. (See, e.g., *People v. Pulido* (1997) 15 Cal.4th 713, 716 [63 Cal.Rptr.2d 625, 936 P.2d 1235].) The felony-murder rule is not here applicable and there is no reason to stretch or constrain criminal liability based upon it. (See, e.g., *People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130]; *People v. Billa* (2003) 31 Cal.4th 1064, 1068 [6 Cal.Rptr.3d 425, 79 P.3d 542].) In a simple

murder case, i.e., not involving the felony-murder rule, a person may aid and abet a murder after the fatal blow is struck as long as the aiding and abetting occurs before the victim dies. After the victim dies, what would be aiding and abetting legally turns into being an accessory "after a felony has been committed." (§ 32.)

### Sua Sponte Instruction on Mistake of Fact

Appellant contends that the trial court erred by failing to instruct the jury sua sponte on the defense of mistake of fact. Appellant argues that such an instruction was required because she "expressly testified that she believed Barto was dead, or had already suffered a lethal injury, at the time she first took any action to clean the house." Appellant argues that this instruction was required "to implement [her] primary defense, founded in [her] testimony, that [she] believed reasonably and in good faith that Barto was already dead before lending any assistance, a defense that negates criminal intent." "[N]o instruction was given that conveyed the defense that appellant's mistake regarding Barto being already dead would be a complete defense to murder liability[.]"

The mistake of fact instruction is set forth in CALJIC No. 4.35: "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if [he] [she] commits an act or omits to act under an actual [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful."

■ "A trial court's duty to instruct, sua sponte, on particular defenses arises ' "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 424 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

The trial court had no duty to instruct the jury sua sponte on the defense of mistake of fact. This was never mentioned as a defense theory in the trial court. Appellant's defense was not that she had aided Miguel in the commission of the murder under the erroneous belief that Barto was already dead. Appellant testified that, upon being informed that Miguel had put Barto in the trunk of his car, she did not know "if [Barto] was dead or alive." Appellant's defense was that she tried to prevent Miguel from attacking Barto. She did not have the intent or purpose of committing, encouraging, or facilitating the commission of the murder, and she did nothing to aid, promote, encourage, or instigate its commission.

Thus, "an instruction on the defense of [mistake of fact] would have been inconsistent with [appellant's] theory of the case. [¶] Accordingly, under these circumstances, the trial court had no sua sponte duty to instruct on the . . . defense. [Citation.]" (*People v. Maury, supra,* 30 Cal.4th at p. 425.) "[W]ithout notice defendant was relying on a mistake-of-fact defense, the trial court could have gummed up the works by instructing *sua sponte* on that theory." (*People v. Guthrie* (1983) 144 Cal.App.3d 832, 843 [193 Cal.Rptr. 54].)

*Jurors' Question Regarding CALJIC No. 3.00*

During its deliberations, the jury submitted a note to the court asking it to "define further" the meaning of "directly and actively" as used in CALJIC No. 3.00. This instruction provided: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who *directly and actively* commit or attempt to commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission or attempted commission of the crime." (Italics added.)

In response to the jury's request, the trial court instructed the jury as follows: "Directly or actively means: Actually performing an act or acts which constitute a crime." Appellant does not argue that this instruction incorrectly defined the meaning of "directly or actively." Instead, she contends that the trial court should have given, sua sponte, instructions on proximate cause in the language of CALJIC Nos. 3.40 and 3.41.

"[W]hen the jury . . . sent a request for further clarification of the [meaning of 'directly and actively'], section 1138 was triggered. The statute provides, in part: 'After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . .' This means the trial 'court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]' . . . However, '[a] definition of a commonly used term may nevertheless be required if the jury exhibits confusion over the term's meaning. [Citation.]' [Citation.]" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1015 [109 Cal.Rptr.2d 464].)

The trial court did not abuse its discretion in defining "directly and actively" without instructing on proximate cause. The jury never indicated that it desired to be informed on causation, which was not an issue in the case.

### *Exclusion of Miguel's Expectation of a Sentence to Prison for Life Without the Possibility of Parole*

The trial court excluded evidence showing that Miguel expected to be sentenced to life imprisonment without the possibility of parole (LWOP). Appellant's trial counsel argued that evidence of Miguel's expected sentence was relevant because it enhanced his credibility. The trial court responded: "I don't think a penalty involves credibility, whether it's a light sentence or a heavy sentence. . . . [T]he fact that he pled to a serious offense and what exactly that punishment is I don't think is relevant and admissible as far as credibility is concerned." The court also expressed concern that the proffered evidence "presents punishment to the jury [so] that they are going to understand exactly what is involved as far as this case is concerned." The court excluded the evidence under Evidence Code section 352: "I think the prejudicial effect . . . outweighs its probative value as far as credibility, and I'll exercise my discretion under 352 to exclude it." Appellant contends that the trial court abused its discretion and violated her due process right to present a defense.

Evidence Code section 352 provides in relevant part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The section " 'gives the trial court broad discretion when weighing the probative value and prejudicial effect of proffered evidence.' [Citation.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 654 [123 Cal.Rptr.2d 345, 51 P.3d 224].) "A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

The trial court did not abuse its discretion. Miguel's expectation that he would be sentenced to LWOP did not make him a more credible witness. As the prosecutor pointed out, Miguel had "nothing to lose" by lying: "We're not going to punish him for purposely getting up here and lying when he's facing a life sentence, so it doesn't establish his credibility one bit."

■ Furthermore, appellant was charged with the same crime to which Miguel had pleaded guilty: murder with a lying-in-wait special circumstance.

Thus, the proffered evidence would have informed the jury that appellant could also expect to be sentenced to LWOP if she were found guilty as charged. The harshness of this penalty might have caused some jurors to feel sympathy for appellant. Yet, "[i]t is fundamental that the trier of fact, be it court or jury, must not consider the subject of penalty or punishment in arriving at its decision of guilt or innocence." (*People v. Moore* (1968) 257 Cal.App.2d 740, 750 [65 Cal.Rptr. 450].) Because the trial court did not abuse its discretion, the exclusion of the proffered evidence did not violate appellant's due process right to present a defense.

## Disposition

The judgment is affirmed.

Coffee, J., and Perren, J., concurred.

Apellant's petiton for review by the Supreme Court was denied October 25, 2006, S146009. Kennard, J., was of the opinion that the petition should be granted.