Filed 7/5/24  P. v. Agaton-Hernandez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051008 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS082497A) |
| v. | |
| FRANCISCO AGATON-HERNANDEZ, | |
| Defendant and Appellant. | |

Following a bench trial held in 2011, the trial court found defendant Francisco Agaton-Hernandez guilty of murder.  Pursuant to a pretrial agreement between Agaton-Hernandez and the district attorney, the court deemed the conviction second degree murder and sentenced Agaton-Hernandez to 15 years to life in prison.  On direct appeal, this court affirmed the judgment, rejecting Agaton-Hernandez's claim that the evidence was insufficient to support the murder conviction.

In 2022, Agaton-Hernandez filed a petition to vacate his murder conviction and be resentenced under former Penal Code section 1170.95[1] (now section 1172.6) (petition).  The trial court found that Agaton-Hernandez made the requisite prima facie showing and ordered an evidentiary hearing.  The prosecution argued that Agaton-Hernandez

_____

[1] Unspecified statutory references are to the Penal Code.

remained liable for murder under current law because he conspired to commit murder and intended to kill. Following an evidentiary hearing based on the trial record and other documentary evidence, the court denied Agaton-Hernandez's petition, finding him guilty of murder under current law as a direct aider and abettor of a deliberate premeditated murder who harbored an intent to kill.

On appeal, Agaton-Hernandez contends there is insufficient evidence to support the aiding and abetting theory of murder liability and this matter should be remanded for reconsideration of his entitlement to relief. The Attorney General does not contest Agaton-Hernandez's factual insufficiency claim. Instead, the Attorney General contends this court may affirm the denial of relief on a theory not specified by the trial court in its ruling and further asserts that substantial evidence supports a finding of guilt under a conspiracy to commit murder theory.

For the reasons explained below, we decide there is no substantial evidence supporting the aiding and abetting theory of murder liability. Because the trial court expressly relied solely on that theory of liability in denying relief, we remand the matter so the trial court may reconsider the evidence and argument presented at the evidentiary hearing and decide in the first instance whether the unconsidered conspiracy theory is a legally valid basis for denying the petition and whether the record proves his guilt on that theory of murder (or some other valid theory) beyond a reasonable doubt.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Trial Proceedings

In 2009, the Monterey County District Attorney filed an information charging Agaton-Hernandez with the murder of Roshni Singh on or about September 28, 2008, (§ 187, subd. (a); count 1) and conspiracy to commit first degree murder (§ 182, subd. (a)(1); count 2). The murder charge included a special circumstance allegation that Agaton-Hernandez aided and abetted the intentional murder of Singh for financial gain (§ 190.2, subd. (a)(1)).

2

In May 2011, pursuant to an agreement with the district attorney, Agaton-Hernandez waived his right to jury trial. In exchange, the district attorney agreed to not pursue "first degree murder charges" or the special circumstance allegation.

1. Evidence Presented at Bench Trial

In July 2011, the trial court held a bench trial. As summarized in our unpublished opinion on direct appeal (*People v. Agaton-Hernandez* (June 27, 2013, H037855) [nonpub. opn.] (*Agaton-Hernandez*)), the evidence demonstrated the following:[2]

Victor Cabrera was Agaton-Hernandez's former boss and the coconspirator in the murder. On September 28, 2008, Cabrera strangled to death his girlfriend, Roshni Singh, sometime between midnight and 2:00 a.m. at their home in Marina. Agaton-Hernandez was working at a donut shop in Seaside at the time, but he joined Cabrera later that morning. Agaton-Hernandez admitted he helped Cabrera cover up the murder by staging a robbery, moving the body, and disposing of evidence. Agaton-Hernandez denied he was involved in planning to kill Singh. He claimed he was unaware of the murder until after Cabrera had killed Singh. However, a witness, Jose Ayuzo, told police that Agaton-Hernandez offered to pay him $30,000 to tie up a woman and batter her. Several hours before Singh was killed, Agaton-Hernandez told Ayuzo to go to a gas station in Monterey to commit the assault, but Ayuzo did not go. Cabrera killed Singh later that night.

---

[2] This court's prior opinion is included in the appellate record because Agaton-Hernandez attached it to a pleading he filed in the trial court. He also asked the trial court to consider that opinion in determining whether he could still be convicted of murder under current law. Relatedly, in this appeal, Agaton-Hernandez requested judicial notice of the briefing filed in his prior appeal. We granted that request. Further, we have reviewed the bench trial transcripts and exhibits admitted at Agaton-Hernandez's section 1172.6 evidentiary hearing and conclude they accord with the factual summary set out in our prior opinion. Under these circumstances, we state the evidence presented at Agaton-Hernandez's bench trial by reiterating the factual summary provided in our prior opinion, but our analysis in this appeal relies on the underlying trial transcripts and exhibits. (Cf. *People v. Clements* (2022) 75 Cal.App.5th 276, 292–293 (*Clements*).) We do not use quotation marks in part I.A.1. to indicate material that is copied directly from this court's prior *Agaton-Hernandez* opinion.

Cabrera worked at the Village Motor Works Gas Station on North Fremont Street in Monterey. On September 28, 2008, the day of the murder, at around 6:30 a.m., Cabrera called 911 from the gas station. When police arrived, they found Cabrera on the floor, with his hands tied behind his back. Candy boxes and other items were scattered on the floor. Cabrera claimed he had been robbed. He said he had struggled to free himself for approximately 45 minutes, until he was able to knock over a phone with his nose and dial 911 with his tongue.

Cabrera told police the following false story: He and Singh had driven to the gas station at about 5:00 a.m. in a red Toyota 4Runner. They were planning to go shopping in Berkeley, but he had left his wallet, jacket, and cell phone charger at the gas station the night before. They went to the gas station to retrieve the items before going to Berkeley. Singh remained in the car while he went into the shop. After he went into the shop, two dark-skinned males entered the shop and robbed him. One had a knife, and the other had a handgun. They took his wallet and cell phone, tied him up, and struck him several times. He did not know what happened to Singh or the 4Runner during the robbery. He noticed that the 4Runner was missing when he was calling 911.

Cabrera gave police permission to search his home in Marina, where they found Singh's wallet and cell phone. Later that day, police found the 4Runner parked at an apartment complex in Monterey. Singh's body was lying face down in the back seat.

Cabrera was the beneficiary of a $600,000 life insurance policy on Singh. A second policy for $360,000 named Singh's son as a beneficiary. Cabrera had planned to take care of Singh's son in the event of her death.

Cabrera disappeared before police could arrest him. At the time of Agaton-Hernandez's trial, Cabrera was still missing.

Police found Agaton-Hernandez through a search of Cabrera's phone records. The records showed calls to and from a phone belonging to "Martin Cerda," an alias used by Agaton-Hernandez. Cabrera had previously been a manager at a Burger King. He had

4

helped Agaton-Hernandez obtain a job at the Burger King by supplying him with a social security number and the Martin Cerda alias.

Agaton-Hernandez made numerous inconsistent statements in multiple interviews with the police. After lying about many aspects of his involvement in the crime, Agaton-Hernandez eventually admitted to the following: Cabrera had visited him at work at Red's Donuts in Seaside on September 27, 2008, the night before the murder, around 10:00 p.m. to 11:00 p.m. Cabrera wanted Agaton-Hernandez to come to Cabrera's home in Marina, but Agaton-Hernandez said he did not get off work until 4:00 a.m. or 5:00 a.m. They then spoke on the phone shortly after 4:00 a.m., when Cabrera again invited Agaton-Hernandez to his home in Marina. Agaton-Hernandez initially claimed he did not know why Cabrera wanted him to go to Marina. Agaton-Hernandez later said Cabrera wanted him to clean the house.

Around 4:30 a.m., Agaton-Hernandez left Red's Donuts, went home, and changed his clothes. He was due at his second job at Burger King at 6:30 a.m. Nevertheless, he took a taxi from his home to Cabrera's home in Marina at around 5:00 a.m. Police interviewed the taxi driver, who confirmed that he drove Agaton-Hernandez to Marina around that time. The driver noticed that Agaton-Hernandez was wearing plastic gloves. Agaton-Hernandez told the driver to drop him off on a corner several houses away from Cabrera's house. Agaton-Hernandez also told the driver he would need another ride later.

When Agaton-Hernandez got to Cabrera's house, Singh was already dead. Agaton-Hernandez claimed Cabrera did not tell him about the murder until he arrived, and that Cabrera had everything planned. Agaton-Hernandez insisted he would not have gone to Cabrera's house if he had known Cabrera had killed Singh.

Agaton-Hernandez said Cabrera invited him in and asked him to help move the body into the car. Singh's body was on a sofa in the living room. Agaton-Hernandez helped Cabrera move the body to the car. Agaton-Hernandez opened the car door, and

Cabrera pushed the body into the car. Agaton-Hernandez also turned over the couch cushions that were underneath the body.

Cabrera and Agaton-Hernandez then took the body to the gas station to stage the robbery. At the gas station, Cabrera gave Agaton-Hernandez a rope. Cabrera told Agaton-Hernandez to tie him up, hit him, and throw around some candy and cigarettes. Agaton-Hernandez tied Cabrera, hit him twice, and threw some candy bars on the floor. Agaton-Hernandez then took Cabrera's cell phone and wallet and threw them in the rear parking lot.

After staging the robbery, Agaton-Hernandez drove the 4Runner with Singh's body in the back to an apartment complex in Monterey, where he parked the car with the body. He threw the car keys into the bushes and called the taxi driver to pick him up. Police later located the keys where Agaton-Hernandez said they were.

Agaton-Hernandez said he helped Cabrera because Cabrera had treated him well and had helped him get a social security number and a job. Agaton-Hernandez said Cabrera was planning to buy the gas station and had promised Agaton-Hernandez a job there. Agaton-Hernandez denied that he asked Cabrera for money, but he said Cabrera had promised to give him money after the crime was completed. Cabrera did not say how much money he would give Agaton-Hernandez.

Police also found Jose Ayuzo after discovering numerous phone calls between Agaton-Hernandez and Ayuzo in the days before the murder. When police interviewed Ayuzo, he initially denied any involvement, but he later admitted Agaton-Hernandez had solicited his help. Ayuzo made multiple different statements, mixed up the timing of events, and gave vague answers to specific questions. At trial, the parties stipulated that Ayuzo, if called to testify, would give testimony consistent with the following:

One week before the murder, Agaton-Hernandez offered Ayuzo $30,000 to help him tie up and batter a woman at a tire shop in Monterey. The money belonged to the woman's boyfriend, who was Agaton-Hernandez's friend. After this conversation,

6

however, Ayuzo was arrested for shoplifting and decided not to help Agaton-Hernandez with the crime. But because Ayuzo feared Agaton-Hernandez, he kept telling Agaton-Hernandez he would help with the assault.

Ayuzo met with Agaton-Hernandez again several days before the murder. Agaton-Hernandez told Ayuzo to meet him at a tire shop and gas station on North Fremont Street in Monterey at 5:00 p.m. on September 27, 2008. The plan was for the woman to arrive there with her boyfriend, whereupon Agaton-Hernandez and Ayuzo would beat her and tie her up.

On the afternoon of September 27, Agaton-Hernandez saw Ayuzo on the street, and offered him a ride. Agaton-Hernandez told Ayuzo to be at the gas station at 5:00 p.m. Ayuzo later said the time was between 5:00 p.m. and 7:00 p.m. Ayuzo turned off his cell phone during part of the evening and did not go to the tire shop. Later that evening, he turned his phone on and called Agaton-Hernandez, who was angry with Ayuzo. Ayuzo said multiple times that he did not hurt Singh or move her body.

Phone records show Agaton-Hernandez and Ayuzo called each other more than two dozen times between September 17 and September 26, 2008. On September 27, Agaton-Hernandez called Ayuzo more than thirty times. On September 28, Agaton-Hernandez called Ayuzo nine times. After 6:45 p.m. on September 27, all of Agaton-Hernandez's calls went to Ayuzo's voice mail. Ayuzo's phone service was canceled on September 28.

2. Verdict and Sentencing

In July 2011, the trial court found Agaton-Hernandez guilty of murder and "direct[ed] that [Agaton-Hernandez] be sentenced as though it were murder in the second degree because that is pursuant to the agreement of the parties."

The trial court found Agaton-Hernandez had recruited Ayuzo to cause harm to Singh two weeks before her death and had intimidated Ayuzo when Ayuzo decided that he did not want to participate. The court said that the only motive for the crime was

money, which could only be garnered by Singh's death.  The court rejected Agaton-Hernandez's assertion that he agreed to participate because he felt indebted to Cabrera for getting him a social security number and work.  The trial court explained that circumstantial evidence proved Agaton-Hernandez knew of the murder before arriving at Cabrera's house on the morning of September 28, 2008.

At a sentencing hearing in August 2011, the district attorney moved to strike or dismiss the conspiracy charge (count 2) and the special circumstance allegation.  The district attorney explained that under the "court trial agreement," he was "mov[ing] to dismiss those kind of things beyond the second degree murder charge" and "the sentence should be second degree murder, 15 to life."  In accord with the agreement and stated conviction, the trial court sentenced Agaton-Hernandez to 15 years to life.

### B.  Direct Appeal

On direct appeal, Agaton-Hernandez raised only one issue; he challenged the sufficiency of the evidence to support his murder conviction.  He contended there was no substantial evidence that he had agreed or intended to agree to murder Singh (as opposed to simply beating and tying her up), Singh's death was not a natural and probable consequence of the conspiracy to assault her, and his postcrime conduct only supported a conviction for accessory after the fact.

In June 2013, this court rejected Agaton-Hernandez's claim of error and affirmed the judgment of conviction.  (*Agaton-Hernandez*, *supra*, H037855, at pp. 7–9.)  The panel opined:  "[Agaton-Hernandez]'s contention that he believed they were simply planning to assault Singh defies logic.  The conspirators would have no motive for the crime unless they killed Singh for the life insurance benefits."  (*Id*. at p. 7.)

### C.  Agaton-Hernandez's Testimony at Cabrera's Trial

In 2018, Agaton-Hernandez testified for the prosecution at Cabrera's trial.  He said that for about two or three weeks before Singh's murder, he had discussions with Cabrera about doing Cabrera a favor for $20,000.  A few days before the murder, Cabrera spoke

8

about killing Singh and told Agaton-Hernandez to find a third person whom they could trust to help with the murder. Agaton-Hernandez found Ayuzo and, as instructed by Cabrera, offered him $20,000 to help with the murder. Under their original plan, the murder was supposed to happen at the gas station the day before Cabrera ended up killing Singh. Because there were several people at the gas station at the appointed time, Cabrera called off the plan. Cabrera and Agaton-Hernandez did not together formulate a new plan.

Later the same night, Cabrera called Agaton-Hernandez several times while he was working at the donut shop, and Agaton-Hernandez did not answer his phone. After Agaton-Hernandez finished his shift (around 3:30 a.m.), he answered a call from Cabrera. Cabrera told Agaton-Hernandez to go to Cabrera's home. Agaton-Hernandez did so, taking a taxi. At that time, Agaton-Hernandez knew that Cabrera still wanted to kill Singh but "didn't know that it was going to happen that same night." At Cabrera's request, Agaton-Hernandez called Ayuzo to join him at Cabrera's home. Ayuzo never arrived.

When Agaton-Hernandez arrived at Cabrera's home, Cabrera said that he had already killed Singh by "chok[ing]" her with a rope. After loading Singh into a vehicle, Cabrera drove them to the gas station. There, pursuant to a plan devised by Agaton-Hernandez and Cabrera, Agaton-Hernandez beat and tied up Cabrera (with the same rope used to strangle Singh) and staged a robbery. Agaton-Hernandez later abandoned the vehicle and Singh's body and threw away her purse and his gloves.

Agaton-Hernandez admitted that he had lied to the police after the crime about his identity and involvement. He denied that he had killed or choked Singh.

### D. Agaton-Hernandez's Statements at His Parole Hearing

At a parole hearing on January 12, 2022, Agaton-Hernandez admitted that he had been willing to kill Singh for money. He described himself at that time as a "kind of a person that was a monster," "irresponsible," "egocentric," and unthinking "about the

9

consequences of [his] decision for easy money." He added, "And due to my immaturity, I did not realize the harm I was causing to the victim, to the family [and] the harm that I caused to society." In addition, Agaton-Hernandez read a "remorse letter" in which he described himself as an "accomplice" of Cabrera and a coward for not calling the police.

### E. Resentencing Proceedings

In October 2022, Agaton-Hernandez on his own behalf filed a petition for resentencing. The trial court appointed counsel to represent Agaton-Hernandez. Later, the court found the petition established a prima facie case for relief and issued an order to show cause (OSC).

The parties submitted briefs and exhibits for the trial court's consideration at the evidentiary hearing. Along with his initial post-OSC brief, Agaton-Hernandez provided the trial court a copy of this court's direct appeal opinion and the transcript of his August 2018 testimony at Cabrera's trial. In his brief, Agaton-Hernandez argued that the "murder occurred outside of the conspiracy and was not the result of his actions." He further asserted that the court was "precluded from choosing a conspiracy to commit murder as the target offense as it has a greater sentence than second degree murder."

The district attorney provided the trial court with the reporter's transcripts from the 2011 bench trial, certain exhibits admitted at that trial (including a police report documenting statements made by Ayuzo and a police interview of Agaton-Hernandez), Agaton-Hernandez's August 2018 testimony, and a transcript of Agaton-Hernandez's January 2022 parole hearing. The district attorney asserted that Agaton-Hernandez "entered into a conspiracy to commit murder," "did it for financial gain," and "subsequently c[a]me clean in [Cabrera]'s trial and to the parole board where he admitted his intent to kill."

In supplemental briefing, Agaton-Hernandez argued, "Conspiracy to commit murder requires a specific intent to kill. Mr. Agaton-Hernandez[] may have had an intent to assist in beating Singh or as an accessory after the fact, but he did not have an intent to

10

kill. Conspiracy to commit murder is always conspiracy to commit first degree murder." He contended that he "cannot be found guilty beyond a reasonable doubt of being a direct aider and abettor with malice in the murder of Singh. The conspiracy to harm Singh was not according to the facts at trial a conspiracy to kill." He further argued, "Even if this Court believes he had malice within a [c]onspiracy at some point, the conspiracy did not kill Singh. [Cabrera] did. [The] People may have malice, but their malice and actions must be the actual and proximate cause of the death." Additionally, Agaton-Hernandez objected to the introduction of the parole hearing transcript submitted by the district attorney.

On May 10, 2023, the trial court held an evidentiary hearing based on the briefing and exhibits submitted by the parties.[3] The court heard oral argument from counsel. The district attorney asserted that the trial evidence and Agaton-Hernandez's testimony at Cabrera's trial proved a conspiracy to commit murder. The district attorney noted that at his parole hearing, Agaton-Hernandez said he got involved in the killing "for the money[] and that he was a monster at the time he did that." The district attorney asserted further that "if [Agaton-Hernandez] were to go on trial today, he would certainly be found guilty of first degree murder under conspiracy to murder." Defense counsel reiterated his argument that the murder "occurred independent and outside of the conspiracy." The district attorney responded that the "proximate cause of the death of Roshni Singh was the conspiracy to murder her for money" and Agaton-Hernandez's and Cabrera's actions showed that "the plan was still in place, the conspiracy was still in place."

The trial court decided that the evidence presented established beyond a reasonable doubt that Agaton-Hernandez is guilty of murder under current law "as a direct aider and abettor of a deliberate premeditated murder who acted with an intent to kill and is therefore ineligible for resentencing." The court stated its agreement with

---

[3] Different bench officers presided at Agaton-Hernandez's trial, sentencing, and section 1172.6 evidentiary hearing.

precedent holding that a defendant's statements at a parole hearing are admissible. Nevertheless, the court found that the People had met their burden of proof "without the statements that [Agaton-Hernandez] made at his parole hearing."

The court explained that Agaton-Hernandez had admitted "express malice" when testifying at Cabrera's trial. The court explained further: "When [Agaton-Hernandez] arrived to commit the murder, the victim, it is true, had already been killed by the Defendant Cabrera. [¶] But then [Agaton-Hernandez], having arrived to help with the killing, not only disposed of the victim's body, but also staged a robbery scene that was very elaborate, including tying up and beating Cabrera at a gas station. So they went to the gas station to do this, throwing some boxes of candy around and then disposing of Cabrera's phone and the victim's bag to further make it look like a robbery. [¶] More recently, [Agaton-Hernandez] did tell the parole board that he agreed to kill the victim because he liked easy money. [¶] And in his letter of apology to the victim's son, he acknowledges that he was Mr. Cabrera's accomplice to the murder. [¶] Theories involving vicarious liability necessary to obtain relief pursuant to Penal Code [s]ection 1172.6 are simply not present here."

The trial court stated, in sum: "If [Agaton-Hernandez] were to be tried under the laws as they apply today, the People would still be able to prove that [Agaton-Hernandez] is guilty of murder beyond a reasonable doubt under current law. That he could also be convicted of conspiracy to commit murder and/or first degree murder does not change the fact that pursuant to Penal Code [s]ection 187 and 188, he acted with a requisite malice aforethought necessary for a conviction of second degree murder."

## II. DISCUSSION

Agaton-Hernandez contends that because there was no proof he did anything to aid or assist in Singh's murder before it occurred, the trial court's denial of his petition on an aiding and abetting theory is not supported by substantial evidence. He argues that his "liability as an aider and abettor hinged on not only his mental state but also his personal

12

commission of some actus reus which 'in fact assist[ed] the achievement of the crime.' "
He further asserts that because the trial court relied on an unsupported theory, "this case must be remanded so the trial court may reconsider whether there is proof beyond a reasonable doubt to convict [him] of second degree murder under any legally valid theory."

The Attorney General makes no argument that the evidentiary hearing record includes substantial evidence supporting the direct aiding and abetting theory relied on by the trial court to deny the petition. Rather, the Attorney General contends that "[e]ven if there were insufficient evidence supporting an aiding and abetting theory of first degree murder, the court's specific reasoning is not essential to its ultimate decision as there was substantial evidence supporting the denial under a currently valid theory of murder." The Attorney General further contends "the statutory framework and the applicable standard of review permit this court to hold that substantial evidence supports the denial of the petition on a theory that [Agaton-Hernandez] was guilty of murder under a conspiracy theory" and "there was substantial evidence supporting this theory of murder."

### A. Legal Principles

"Senate Bill [No.] 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*), superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869; see § 188, subd. (a)(3) ["Malice shall not be imputed to a person based solely on his or her participation in a crime."].)

Senate Bill No. 1437, however, did not eliminate direct aiding and abetting liability for murder "because a direct aider and abettor to murder must possess malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 848; see also *People v. Reyes* (2023) 14

13

Cal.5th 981, 990–991 (*Reyes*) [explaining direct aiding and abetting of implied malice murder]; *People v. Ervin* (2021) 72 Cal.App.5th 90, 101 ["Liability for intentional, target offenses is known as 'direct' aider and abettor liability."].)  "A direct aider and abettor's 'guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' "  (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 124, quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117.)  "[P]roof of aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime."  (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*); *People v. Lee* (2003) 31 Cal.4th 613, 623–624.)

"A person is 'concerned' [in the commission of the crime under section 31] and hence guilty as an aider and abettor if, with the requisite state of mind, that person in any way, directly or indirectly, aided the actual perpetrator by acts or encouraged the perpetrator by words or gestures."  (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529.)  "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission.  [Citations.]  However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense.' "  (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)  "In a simple murder case, i.e., not involving the felony-murder rule, a person may aid and abet a murder after the fatal blow is struck as long as the aiding and abetting occurs before the victim dies.  After the victim dies, what would be aiding and abetting legally turns into being an accessory 'after a felony has been committed.' "  (*People v. Celis* (2006) 141 Cal.App.4th 466, 473–474.)

14

"The doctrine of conspiracy plays a dual role in our criminal law. First, conspiracy is a substantive offense in itself—'an agreement between two or more persons that they will commit an unlawful object (or achieve a lawful object by unlawful means), and in furtherance of the agreement, have committed one overt act toward the achievement of their objective.' [Citations.] Second, proof of a conspiracy serves to impose criminal liability on all conspirators for crimes committed in furtherance of the conspiracy." (*People v. Salcedo* (1994) 30 Cal.App.4th 209, 215; *People v. Valdez* (2012) 55 Cal.4th 82, 150 ["Our decisions have 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.' "].)

"Although murder liability is divided into different degrees and can rest on different theories [citation], conspiracy to commit murder can only take a single form: It 'requires a finding of unlawful intent to kill, i.e., express malice' [citation] and 'is necessarily conspiracy to commit premeditated and deliberated first degree murder.' "[4] (*People v. Ware* (2022) 14 Cal.5th 151, 167; see *People v. Swain* (1996) 12 Cal.4th 593, 602; *People v. Whitson* (2022) 79 Cal.App.5th 22, 35 (*Whitson*) [explaining that a conviction of conspiracy to commit murder "is based on the conspirator defendant's own subjective *mens rea*: conspiracy to murder requires that a defendant either act with malice or intend to kill"].)

A defendant convicted of conspiracy to commit murder is not eligible for resentencing under section 1172.6. (See *People v. Allen* (2023) 97 Cal.App.5th 389, 395 [a defendant is not eligible for relief under section 1172.6 if "convicted [] of murder . . .

---

[4] As discussed *ante* (pt. I.A.2.), pursuant to a pretrial agreement in which Agaton-Hernandez waived his right to a jury trial, the trial court deemed Agaton-Hernandez's conviction as second degree murder, "which is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

on a conspiracy theory"]; *Whitson*, *supra*, 79 Cal.App.5th at p. 32 [explaining that a finding of intent to kill for conspiracy to murder "would have precluded relief for the murder conviction, as [the defendant] could still be convicted under section 188, following the amendments effected by Senate Bill [No.] 1437"]; *People v. Medrano* (2021) 68 Cal.App.5th 177, 182–186.)

"Senate Bill [No.] 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*People v. Strong* (2022) 13 Cal.5th 698, 708.) When the trial court receives a petition under section 1172.6 requesting vacatur of a murder conviction and resentencing, and "containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.] If, instead, the defendant has made a prima facie showing of entitlement to relief, 'the court shall issue an order to show cause.' " (*Ibid*., citing *People v. Lewis* (2021) 11 Cal.5th 952, 970–972, § 1172.6, subd. (c).)

" 'Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' (§ 1172.6, subd. (d)(1).) 'At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 450.)

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " ' 'in the

16

light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] But where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

### B. Analysis

We agree with Agaton-Hernandez that the evidentiary hearing record here does not include substantial evidence supporting his guilt of murder as a direct aider and abettor. There is no substantial evidence demonstrating beyond a reasonable doubt that Agaton-Hernandez engaged in conduct that in fact assisted Cabrera in his achievement of the murder of Singh. (See *Perez*, *supra*, 35 Cal.4th at p. 1225.)

The parties dispute whether, notwithstanding that evidentiary insufficiency, this court may affirm the trial court's denial of Agaton-Hernandez's petition by relying on the conspiracy to murder theory that the trial court did not apply. Agaton-Hernandez contends the trial court's sole reliance on a factually unsupported theory of direct aiding and abetting requires that we remand for reconsideration of any other legally valid theory of liability. The Attorney General, by contrast, asserts that no remand is required because we may affirm the trial court's denial on any viable theory of murder and there is sufficient evidence in the evidentiary hearing record to support Agaton-Hernandez's murder conviction based on a conspiracy theory. The Attorney General further asserts that section 1172.6 "does not preclude a finding that [Agaton-Hernandez] could be convicted of first degree premeditated murder under a conspiracy theory for purposes of determining whether vacating the conviction is required, notwithstanding that he was actually convicted of second degree murder" at his original bench trial.

In reply, Agaton-Hernandez maintains that he is "not here arguing [] that the conspiracy theory lacked factual support." Rather, he purports to challenge "the

sufficiency of the evidence on the specific legal theory relied on by the trial court" and asserts that "error is akin to a jury instruction on a factually unsupported legal theory," "which requires reversal when the record shows 'a reasonable probability that the jury [(or here, the trial court)] in fact found the defendant guilty solely on the unsupported theory.' " He further contends "it is at least arguable that, by prohibiting a first degree murder sentence in [this] case [under the pretrial agreement], section 1172.6, subdivision (d)(1) necessarily prohibits the use of a legal theory specific to first degree murder" (i.e., conspiracy to commit murder) to deny his petition. Nonetheless, he does not seek a decision on that issue (which the trial court did not address) and urges us to conclude that "the appropriate remedy is to remand this case so the trial court may reconsider [his] petition under the alternate legal theory of conspiracy."

Under the present circumstances, we decide that reversal and remand for further proceedings on Agaton-Hernandez's petition are warranted. In denying the petition, the trial court explicitly relied on a direct aiding and abetting theory and eschewed deciding whether guilt of murder on a conspiracy theory could serve as a ground for denying relief.

We acknowledge that section 1172.6, on its face, allows the trial court to deny relief if the prosecution proves guilt of "murder" under "California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019" (*id*., subd. (d)(3)) and does not require the trial court to make specific findings or select between theories of liability when denying the petition. But section 1172.6, subdivision (d)(3) expressly contemplates that the trial court determine beyond a reasonable doubt whether the prosecution proved the petitioner's guilt under a valid theory of murder. It is not our role as a reviewing court to decide whether the prosecution met its burden in the trial court on a theory of liability that the trial court plainly decided not to consider. (See *Clements*, *supra*, 75 Cal.App.5th at p. 298 ["Our job on review is different from the trial judge's job in deciding the petition."]; see also *People v. Pennington* (2017) 3 Cal.5th 786, 800

18

[" 'Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.' "].)

"Ordinarily, of course, a trial court's reasons for ruling in a particular manner are not reviewable on appeal.  [Citation.]  An exception is made, however, when the court's comments unambiguously disclose that it failed to pass on the merits of the issue [citation], or that its ruling embodied, or rested upon, a misunderstanding of the relevant law [citation] or an arbitrary or irrational point of view."  (*People v. Penoli* (1996) 46 Cal.App.4th 298, 305–306; cf. *People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302–1303.)  Here, the trial court expressly limited its consideration of the evidence to the theory of direct aiding and abetting—a theory that the Attorney General does not defend on appeal and which we have concluded lacks substantial supporting evidence.

The trial court's sole reliance on the factually unsupported aiding and abetting theory to deny the petition requires reversal and remand for the court to consider the evidence under other valid theories of murder liability.  (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130; *People v. Vargas* (2001) 91 Cal.App.4th 506, 564 ["where the jury is presented with several factual theories for conviction, some of which are predicated upon insufficient evidence, 'the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory' "]; see also *People v. Arnold* (2023) 93 Cal.App.5th 376, 390–391 [remanding for a new section 1172.6 hearing because the trial court had relied on an erroneous conclusion that the defendant stabbed the victim]; *People v. Henley* (2022) 85 Cal.App.5th 1003, 1021 [remanding for a new evidentiary hearing where "the superior court erred in determining that [the defendant] was armed during the commission of the robbery in contradiction to the jury's opposite finding at trial" and that finding "appears to have been one of the most important facts" relied on to deny relief].)

We express no opinion on the legal validity of or the sufficiency of the evidence for liability based on conspiracy to commit murder. We leave those issues for decision by the trial court in the first instance. We reverse the trial court's order, remand the matter, and instruct the trial court to reconsider the evidence and argument presented at the evidentiary hearing and decide whether the conspiracy theory is, as a matter of law, a proper basis for the denial of Agaton-Hernandez's petition and whether the evidence proves his guilt on that theory of murder (or some other valid theory) beyond a reasonable doubt.

## III.  DISPOSITION

The May 10, 2023 order denying Agaton-Hernandez's Penal Code section 1172.6 petition is reversed and the matter is remanded for further proceedings consistent with this opinion. The trial court is directed to reconsider, under Penal Code section 1172.6, subdivision (d), whether the prosecution has met its burden to prove beyond a reasonable doubt that Agaton-Hernandez is guilty of murder under California law as amended by the changes to Penal Code section 188 or 189 made effective January 1, 2019.

_____
Danner, J.

WE CONCUR:



_____
Bamattre-Manoukian, Acting P. J.




_____
Bromberg, J.



**H051008**
***People v. Agaton-Hernandez***