Filed 12/5/25  P. v. Hampton CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES EDWARD HAMPTON et al.,<br><br>    Defendants and Appellants.</td><td>D085923<br><br>(Super. Ct. Nos.:<br>FV122001538<br>FVI22001539)</td></tr>
</table>

APPEALS from two judgments of the Superior Court of San Bernardino County, Miriam Ivy Morton, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant James Hampton.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant Rasheed Ahmed Bey.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

James Edward Hampton and Rasheed Ahmed Bey appeal from a pair of judgments following their convictions on one count of first degree murder

and, in the case of Bey, one count of willful, deliberate, and premeditated attempted murder.

Bey contends his convictions should be reversed because: (1) substantial evidence did not support the convictions; (2) the trial court did not give the jury an instruction he contends it should have given; (3) the prosecutor engaged in misconduct; (4) the trial court should have granted a mistrial based on that alleged misconduct, and (5) the same alleged misconduct violated the Racial Justice Act.

Hampton contends *his* conviction should be reversed because the trial court gave the jury an instruction he contends it should *not* have given.

In addition, each defendant contends his sentence should be reversed because the trial court applied an incorrect legal standard in denying a motion to dismiss or strike firearm enhancements.

The attorney general disagrees with the defendants' arguments, and so do we. Hence we affirm.

## I. BACKGROUND

## A. The Shooting Incident at Lillian Park

Hampton and Bey's convictions arise from a shooting incident that occurred one summer day at a public park in Barstow. On the day in question, a crowd of people gathered at Lillian Park for a children's baseball game. After the game ended, a group of children and adults became involved in a heated argument. Twenty-four-year-old Delmar Phillips intervened in what he describes as an effort to deescalate the situation, but ended up provoking Allison Hampton, whose child had been involved in the argument.

2

Allison[1] claims that, during this confrontation, Phillips called her a bitch and said he would "air the park out"—a statement that one witness who testified at trial said was a threat to use a firearm to "shoot[ ] up the park." (See *post*.) Phillips claims that Allison said "she was going to get someone to knock [him] out." At the end of this confrontation, Allison got into her car and drove away, and Phillips departed the area with his niece and nephew.

At about 6:25 p.m. the same day Phillips, having returned to the area, was sitting in a gray car parked across the street from the park. Standing nearby was his close friend, 23-year-old Donta Hayes.[2]

At 6:26, two cars pulled up and parked on the opposite side of the street, alongside the park. The first car was occupied by Allison, the second by her brother—Hampton—and her boyfriend, Bey.

Allison, Hampton, and Bey exited the cars in which they had arrived and proceeded toward the middle of the street, between Allison's car and the gray car; and there they came into contact with Phillips and Hayes.

Time-stamped video and audio from a nearby home's Ring doorbell system reveals what happened next on all sides of the gray car. We summarize the events seen on the footage, second by second, using the video time stamp as follows:

:01      Allison, trailed by Bey, walks toward Phillips, who slowly retreats backward, until each of them is in front of the hood of the gray car. Meanwhile, on the far side of the car, Hampton—gripping a gun in both hands—raises and extends his arms to

---

[1]    We refer to Allison Hampton by her first name because she shares the same last name as one of the defendants. We do so for the sake of clarity, intending no disrespect.

[2]    According to Phillips, he (Phillips) and Hayes had returned to the park to see if anything was going to happen as a result of Allison's threat. A third man, known to Phillips as Astro, was also present.

3

point it at Hayes, who is standing just a few feet away from him.

:02      In front of the hood of the car, Bey pulls Allison back and away from Phillips.

:02-:03      On the far side of the car, Hayes begins retreating backward, and Hampton lowers his arms.

:05      Hayes—still standing on the far side of the car, facing Hampton—extends his arms sideways and away from his body, his fingers outstretched in what appears to be a conciliatory gesture. Meanwhile, on the near side of the car, Phillips begins walking alongside the car.

:05-:07      Bey rounds the front end of the car and follows Phillips along the near side of the car until they are facing one another beside the front passenger door.

:08-:09      Still on the near side of the car, Bey throws a punch at Phillips. Phillips blocks it, jumps backward along the side of the car, and steps into the street a few feet behind the car.

:09-:10      Hampton raises and extends his arms again, still gripping the gun in both hands. He fires it at Hayes from close range, sending Hayes to the pavement behind the car. At the sound of the gunshot, Bey (still on the near side of the car) ducks and Phillips turns and begins running up the street.

:11-:12      As Hayes struggles on the pavement, partly obscured by the car, Hampton fires at him a second time, again from close range. Phillips continues running up the street and veers off toward the park. Someone says "Tree Top." Bey reaches into his pants pocket and begins taking the first of several steps forward toward the rear of the car, as Hampton fires his gun a third time (again from close range) at Hayes, who is still on the pavement. Hayes scrambles to his feet on the far side of the car and begins to run away from Hampton and toward the rear of the car, as Hampton fires his gun at Hayes a fourth time. Phillips continues running up the street and toward the park.

:13      Hayes rounds the rear end of the car and nearly collides with Bey. Phillips reaches the park and continues running.

:14-:16  After having nearly collided with Bey behind the trunk of the gray car, Hayes loses and regains his footing, then runs across the street, around the rear of *Allison's* car, and into the park beyond.  As Hayes rounds the rear of Allison's car, Bey advances into the middle of the street and, while running, fires his gun twice in Hayes's direction.  Hampton turns away from Hayes and walks back to Bey's car.

:17-:18  After having fired his gun twice in Hayes's direction, Bey pivots to his left and fires it two or three times in the direction that Phillips (no longer in the Ring camera frame) has run.  Bey then turns away from Phillips and begins jogging toward his car.

:19-:28  Bey returns to his car, and gets back into the driver's seat.  He drives away with Hampton (who has returned to the passenger seat).  Allison (who has already returned to her car) drives away at the same time.

None of the bullets that Hampton and Bey fired struck Phillips.  But three of them—all fired by Hampton—did strike Hayes.

Hayes was responsive when he was placed in Astro's car shortly after the shootings.  But he died at or enroute to the hospital.

**B.    The Charges and the Prosecution Theory of the Case**

In response to the shooting incident, the People filed an information that charged Hampton and Bey with murder as to Hayes (count 1) and with willful, deliberate, and premeditated attempted murder as to Phillips (count 2).[3]  The accusation set forth in count 1 was that, on the date in question, "the crime of murder, in violation of Penal Code section 187(a),[4] a felony,

---

3    The information also included firearm allegations against Hampton and Bey (see *post*), and murder and attempted murder charges against Allison.  Inasmuch as Allison was not tried with Hampton and Bey, and is not before us on this appeal, we do not concern ourselves here with the case against her.

4    All unspecified statutory references are to the Penal Code.

5

was committed by James Edward Hampton III, Rasheed Ahmed Bey and Allison Janay Hampton, who did unlawfully, and with malice aforethought murder Donta Jarome Hayes, a human being." The accusation set forth in count 2 was that, on that same date, "the crime of willful, deliberate, and premeditated attempted murder, in violation of Penal Code section 664/187(a), a felony, was committed by James Edward Hampton III and Rasheed Ahmed Bey, who did unlawfully and with malice aforethought attempt to murder Delmar Ray Phillips, a human being."

At trial, the prosecution proceeded on a theory that each defendant had engaged in deliberation and premeditation in the commission of both offenses. The defendants, for their part, argued (among other things) provocation and self-defense.

## C.    The Evidence at Trial

Nine witnesses testified at trial. These included a police officer, a crime scene investigator, a corrections officer, a forensic pathologist, a ballistics expert, and a detective. The witnesses also included three individuals who had witnessed or participated in the second confrontation: Frank English, an eyewitness to the shooting incident who lived across the street from Lillian Park; Phillips; and Hampton.

In addition to being presented with witness testimony, the jury also was presented with various exhibits—including video and audio from the Ring doorbell system, which was played numerous times throughout the trial.

### 1.    English Testimony

English testified that he had witnessed both confrontations on the day in question. Regarding the first confrontation, he said he had seen a young man (presumably Phillips) intervene to de-escalate an argument that had erupted among several children and a woman he believed to be the mother of

6

one of children.  The woman argued with the young man, and then she and the young man went their separate ways.

As to the second confrontation, English testified that, before the cars occupied by Allison, Hampton, and Bey pulled up to the area where Phillips was sitting in the gray car, they first stopped beside one another in front of his house, that Hampton or Bey asked, "Is that him," and that Allison gestured toward Phillips, Hayes, and the gray car and responded, "No, it's them down there."[5]

Then, when Allison, Hampton, and Bey pulled up across the street from the gray car and exited their own cars, Allison "act[ed] like she want[ed] to fight" Phillips.  Bey pulled her back and approached Phillips as though *he* wanted to fight him, and Phillips looked as though he would defend himself with his hands.  But then Hampton and Bey pulled out guns, started shooting, and "everybody took off running."

There were some discrepancies in English's testimony as to his location during the period of time when the guns were being fired and whether he had remained in a good position to see and hear what was happening or had instead retreated to an area of his property that was more remote.

At no point did Phillips or the other young men with him act aggressively toward Allison, Hampton, or Bey, and at no point did any of the young men display a weapon.

### 2.    Phillips Testimony

Phillips testified as a reluctant witness, under compulsion of the trial court after having been placed in custody on a warrant for failing to appear

---

[5]    During his testimony, English did not refer to any of these individuals by name.  When asked "Did you know any of the[ ] parties involved?" he responded:  "I didn't know nobody."

as a witness in the case. Regarding the first confrontation, he testified in a manner that was generally consistent with the above described testimony of English. In addition, during his direct examination, he denied that he had called Allison a bitch or that he or Hayes or Astro had made any threats; but, during cross-examination, he wavered on both denials.

As to the second confrontation, Phillips testified that, in the seconds before Hampton fired the first bullet, he (Phillips) had been "trying to tell [Bey] that nobody called [Allison] a B word."[6] He acknowledged having told a detective several weeks after the incident that, during that same timeframe, Bey had asked, "Who hit my wife" and "I want to talk to the person that hit my wife," and he testified that he had responded initially by saying " 'nobody hit your wife, fool,' " but that he had then said " 'that's me, so come on,' " and that was when Bey "took a swing" at him. Phillips also acknowledged that, when Hampton fired the first bullet (i.e., at the moment the Ring doorbell video shows Bey ducking beside the gray car), Bey "seemed surprised . . . by the shot."[7]

During direct and redirect examination, Phillips testified that neither he nor anyone with him had been armed at the park that day. But, when asked on cross-examination if he would lie in order to protect Hayes if Hayes *had* been armed or if Hayes had threatened to air out the park,[8] he

---

[6] During his testimony, Phillips did not refer to Bey, Hampton, or Allison by name. He testified he did not know any of them.

[7] The defense notes that jurors also heard, and the court admitted in evidence, an audio recording of Phillips's interview by the detective, and that a transcript of that interview says Phillips told the detective that Bey's motion as he took the gun out of his pocket was " 'hesitatin.' "

[8] It is unclear whether Hayes was present during the earlier of the two confrontations at the park.

8

responded in a way that, though muddled, could reasonably be interpreted as indicating that he would perjure himself to protect his deceased friend's reputation.

### 3. Detective Sanchez Testimony

Detective Jose Sanchez testified that, three weeks after the shootings, he and another detective interviewed Bey.[9]  According to Sanchez, Bey did not admit to having shot at Hayes or Phillips.  Instead, he "maintain[ed] that he had never shot a gun in Barstow" at all.  Although Sanchez and his colleague "tried to make [Bey feel] as relaxed as possible" during the interview, Bey "seemed nervous"—so much so that, "at one point . . . , as he was smoking his cigarette, he was poking himself in the cheek looking for his mouth because he couldn't find his mouth."  Bey cried throughout the interview, and, by the end of the interview, he was "shaking," "sweating profusely" and "throwing up."

### 4. Hampton Testimony

Hampton testified that a revolver he had surrendered to authorities was the gun he had used during the incident.  He further testified that Bey was his sister's boyfriend, that he and Bey were not close (having known one another for only about 60 days) and that, on the day of the incident, the two of them had been traveling together in Bey's car.  As Bey drove near Lillian Park, they happened upon Allison in her car.  Having grown up with Allison, Hampton could tell when something was bothering her; and, on this particular occasion, as he and Allison spoke to one another from the respective cars in which they were seated, he "could tell by her energy that

---

[9]   Jurors heard, and the court admitted in evidence, an audio recording of part of Sanchez's interview of Bey.  In addition, jurors received a partial transcript of the interview.

9

something was bothering her a lot." "She was crying, . . . her eyes was watering, and . . . her breathing and all that was off, so I [knew] . . . she [was] upset about something." "She was very afraid."

When Hampton asked Allison what was going on, she told him—within earshot of Bey, who was sitting in the driver's seat)—that some "guys at the park . . . were talking about shooting up the park over a kid fight." The specific words she used were "air the park out"—which to Hampton connoted a threat to use a firearm in the park, signifying a risk of physical harm or death for himself, Allison, and their family.

Shaken, Hampton asked Allison where the troublemakers were. Without uttering a word in response, Allison made a U-turn and drove toward the park. And without discussing the matter, Hampton and Bey followed her. Then, within 50 seconds after having encountered Allison, they pulled up to where Hayes and Phillips were standing.

As they drove to the park, Hampton's intent was "basically to see who [Allison] had "got into it with, and was it a threat or not or [was] it somebody [he would just] have to talk to . . . [to] resolve the situation" and "hopefully come up with a solution to the problem." He and Bey were not "looking for a target," and he "didn't [even] think the guys . . . were going to still be there." But they *were* there, and this fact presented a further cause for concern because: "For them to . . . still [be there] they must be planning to do . . . some real harm." In addition, the situation was evocative of an occasion, several years earlier, when he'd been shot while trying to mediate a scuffle at a basketball game.

Hampton's description of the second encounter is as follows: "As I was pulling up, I hear somebody say, 'on their dead homies,'" which is a "type of slang" that "I heard . . . all my life, basically from family members who [were]

10

involved with gangs." Then, "when I got out of the car, I noticed a guy [Hayes] walking toward me with both of his hands in his pants," "like he was gripping something." "I couldn't tell because I didn't . . . have my glasses on." "I was already assuming these guys had weapons based on [Allison having said that] they were talking about airing out the park." "I felt my life was in danger at that point. It was like déjà vu for me." So "I raised the gun at first," and then "I immediately put it back down." "That was like . . . a warning . . . . I was basically giving him an opportunity to take his hands out of his pants and let me know he is not a threat to me." But "he kept coming towards me." "He said nothing to me." Instead, "he continued to walk in my direction," despite "me being twice his size." When "he [kept] walking in my direction with his hands not visible, I [was] feeling that he [was] a threat to me." "It wasn't even a split second. When I put the gun down, I raised it back up, and I started firing." "In my head it was like, all right, who is going to be quicker to pu[ll] out their weapon and fire? So that's why I fired my shots."

      In firing those shots, Hampton was not trying to hurt Hayes; he was only intending to scare him. When he saw Hayes get up and run off through the park, he thought his bullets had missed, and he did not realize that Hayes had been injured. Because "the person that [he had] thought was a threat [Hayes] was running away," Hampton no longer perceived a threat. Thus he stopped shooting, turned his back toward Hayes, and walked back to Bey's car. Then he and Bey drove away.

      At no point did Hayes, Phillips, or Astro threaten Hampton verbally and at no point did Hampton see any of them with a gun. As for the guns that he and Bey introduced into the mix, at no point that day did he and Bey have a conversation with one another about killing or hurting anyone or

teaching them a lesson. In fact, neither of them even knew the other had a gun; and no one encouraged him to shoot his gun. He did that "100 percent on [his] own;" and he shot only at Hayes, not at Phillips.

Although the Ring doorbell video reveals otherwise, Hampton testified repeatedly that, from the moment he arrived at the park until the moment he stopped firing at Hayes, Hayes's hands never left the waistband of his pants.

## D.     Jury Instructions

At the close of evidence, the trial court instructed the jury. On count 1 (pertaining to the killing of Hayes) it included, in its charge to the jury, instructions for murder, for willful, deliberate, and premeditated murder,[10] and for aiding and abetting. But it did *not* include an instruction for attempted murder on that count.

On count 2 (pertaining to the shots that had been fired at Phillips) the court included instructions for attempted murder and for willful, deliberate, and premeditated attempted murder.

In addition, the court included instructions for several defenses, lesser included offenses, use of a firearm, and (see *post*) a testifying defendant's failure to explain or deny evidence against him.

## E.     Convictions, Sentences, and Appeals

On count 1 the jury convicted each defendant of willful, deliberate, and premeditated murder in the killing of Hayes. In addition, it made true findings that each defendant had personally used and discharged a firearm in the commission of that offense, and that Hampton's discharge of a firearm had caused Hayes's death.

---

10     As explained *ante*, murder perpetrated by means of a willful, deliberate, and premeditated killing is first degree murder.

On count 2 the jury convicted Bey of willful, deliberate, and premeditated attempted murder as to Phillips, and it made true findings that Bey had personally used and discharged a firearm in the commission of the offense. But it *acquitted* Hampton of attempted murder and attempted voluntary manslaughter.

Thereafter, the court sentenced Hampton to an indeterminate term of imprisonment of 50 years to life; and it sentenced Bey to a determinate term of 40 years, followed by an indeterminate term of 32 years to life. (See *post*.)

Each defendant timely appealed.

## II.  DISCUSSION

As noted *ante*, Bey and Hampton make several contentions in support of arguments that their convictions and sentences should be reversed.

## A.  Sufficiency of the Evidence Against Bey

Bey's first contention is that neither of his convictions is supported by substantial evidence. In asserting this contention, he does not dispute that he and Hampton drove to the park intending to confront whoever had antagonized Allison earlier in the day. Nor does he challenge the jury's finding that he fired his gun at Hayes and Phillips with the intent to kill them. (Indeed, to the contrary, he concedes "the video captured Bey firing at Hayes and Phillips with what can be inferred to have been an intent to kill.") Instead he contends the evidence as to each of his convictions fell short insofar as it pertained to his mental state. In addressing this contention, we begin with the standard of review applicable to claims that a conviction lacks sufficient evidentiary support.

### 1.  Standard of Review

"In evaluating a claim that a conviction lacks sufficient evidence, ' "we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could

13

find the defendant guilty beyond a reasonable doubt." ' " (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1019 (*Wear*).) " ' "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' " (*Ibid.*) " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v. Davis* (2024) 107 Cal.App.5th 500, 509–510.)

As has often been said, " '[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court*"—or, in this case, the jury—"*believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363 (*Ortiz*).) "[R]eversal is required only if ' "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " ' " (*Wear, supra,* 44 Cal.App.5th at p. 1020.)

"Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*Wear, supra*, 44 Cal.App.5th at p. 1020.) "Nevertheless, there must be 'substantial evidence,' that is, evidence that is ' " 'reasonable . . . , credible, and of solid value.' " ' " (*Ibid.*) "In particular, a reasonable inference

14

from the evidence ' " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " ' " (*Ibid.*)

### 2. Legal Principles

We apply the standard of review just discussed to both offenses on which Bey was convicted—i.e., to willful, deliberate, and premeditated murder and to willful, deliberate, and premeditated *attempted* murder. Inasmuch as each of these offenses implicates the concept of murder, we begin our discussion of the applicable legal principles with the definition of murder.

### a. Murder

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Such malice may be either of two types: express or implied. (§ 188, subd. (a).) It "is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.,* subd. (a)(1).) It "is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.,* subd. (a)(2).)

### b. Attempted Murder

"Attempted murder is . . . a ' " 'specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." ' " (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 456.) Notably, the "[i]mplied malice [that can support a conviction of murder] cannot support a conviction of *attempted* murder" because the "specific intent to kill" element of attempted murder "requires express malice." (*Ibid.*, italics added.) Consequently, whereas the mental state required to convict a defendant of murder may be met by establishing *either* implied malice *or* express malice,

15

the mental state required to convict a defendant of *attempted* murder may be met only by establishing *express* malice. (*People v. Bland* (2002) 28 Cal.4th 313, 327–328; *People v. Stone* (2009) 46 Cal.4th 131, 139–140 ["Attempted murder requires express malice, i.e., intent to kill. Implied malice—a conscious disregard for life—suffices for murder but not attempted murder."].)

### c.    Degrees of Murder

When a murder is perpetrated by means of a willful, deliberate, and premeditated killing, or by a variety of other means set forth in the Penal Code, it is classified as "murder of the first degree" (§ 189, subd. (a)), otherwise known as first degree murder. When a murder is perpetrated by *other* means, it is classified as "murder of the second degree" (*id.*, subd. (b)), or second degree murder.

### d.    Deliberation and Premeditation

For a murder or attempted murder to qualify as deliberate and premeditated, the perpetrator must have acted " 'deliberately, carefully weighing the considerations for and against a choice to kill before he or she complete[d] the acts that caused the death' " (*People v. Gomez* (2018) 6 Cal.5th 243, 282 (*Gomez*)) or (for attempted murder) the acts that were *intended* to cause death.

But neither of these requirements—deliberation and premeditation—requires the passage of any minimum period of time. Instead, as our Supreme Court has repeatedly said: " ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' " (*Gomez, supra,* 6 Cal.Cal.5th at p. 282; see also *People v. Solomon* (2010) 49 Cal.4th 792, 813 ["a killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on

16

unconsidered or rash impulse"].) Moreover, for a murder to qualify as deliberate and premeditated, "it is not necessary to prove [that] the defendant maturely and meaningfully reflected upon the gravity of [his] act." (§ 189, subd. (d).)

### e. Aiding and Abetting Murder

The Penal Code imposes liability for the commission of a crime on persons who "aid and abet in its commission." (§ 31.) "If the defendant himself commits the offense, he is guilty as a direct perpetrator. If he assists another, he is guilty as an aider and abettor." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*).)

"[A]n aider and abettor's guilt 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state'. [Citation.] ' "[O]nce it is proved that 'the principal has caused an actus reus, the liability of [a person accused of aiding and abetting him in committing that actus reus] should be assessed according to his own mens rea.' " ' [Citation.] Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*Perez*, *supra*, 35 Cal.4th at p. 1225; see also *People v. Thompson* (2010) 49 Cal.4th 79, 116–117.) Such conduct exists when the aider or abettor "by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561; see also *People v. Singleton* (1987) 196 Cal.App.3d 488, 492 ["Factors relevant to a determination of whether [a] defendant [is] guilty of aiding and abetting include: presence at

17

the scene of the crime, companionship, and conduct before and after the offense."].)

As to the first of the three elements of aiding and abetting (i.e., knowledge of the perpetrator's unlawful purpose), "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1166.) Hence, for a defendant to be convicted of a willful, deliberate, and premeditated murder on an aiding and abetting theory, it must be established beyond a reasonable doubt that *both* the principal *and* the defendant charged with aiding and abetting deliberated and premeditated before or during the commission of the murder.

### 3. Analysis

There is no dispute that Bey's conviction for the willful, deliberate, and premeditated murder of Hayes was premised on an aiding and abetting theory, because the bullets that resulted in Hayes's death were fired by Hampton. Thus, applying the principles discussed *ante,* conviction of Bey for this offense would be supported if the jury were to find beyond a reasonable doubt: that Hampton carefully weighed (even if only briefly) the considerations for and against a choice to kill Hayes and then deliberately fired the fatal bullets at Hayes; that, before or during the commission of the murder, Bey knew and shared Hampton's unlawful purpose; and that Bey carefully weighed (even if only briefly) the considerations for and against a choice to kill Hayes and then deliberately but ineffectually fired *his* gun at Hayes. And conviction of Bey for the offense of willful, deliberate, and premeditated *attempted* murder of Phillips would be supported if the jury were to find beyond a reasonable doubt that Bey carefully weighed (even if

18

only briefly) the considerations for and against a choice to kill Phillips and then deliberately but ineffectually fired his gun at Phillips.

Bey concedes Hampton fired the fatal bullets at Hayes. He also arguably concedes Hampton deliberated and premeditated about killing Hayes before he fired those bullets.[11] And he concedes substantial evidence supported a finding that he (Bey) fired at Hayes and Phillips with an intent to kill them. But he contends substantial evidence did *not* support findings: that he knew and shared Hampton's unlawful purpose when Hampton fired his gun at Hayes; that he deliberated and premeditated about killing Hayes before he fired *his* gun at Hayes; or that he likewise deliberated and premeditated about killing *Phillips* before firing at *him*.

In support of this argument Bey cites Hampton's testimony that he and Bey drove to the park intending only to confront (rather than to shoot or kill) whoever had antagonized Allison, that neither of them knew the other was armed, that they did not discuss what they were going to do, and that Hampton made the decision to shoot "100 percent on [his] own." He also cites other witnesses' testimony, along with the Ring camera evidence, revealing that Bey swung at Phillips with his fist, that he ducked and looked surprised when shots rang out, and that he did not draw his gun until after Hampton had fired *his* gun and Hayes and Bey had nearly collided with one another.

---

11 Bey argues that: "Whatever degree Hampton did or did not reflect on his actions, the video shows the very opposite as to Bey. His gun, by way of contrast, was concealed in his pocket and he was swung at Phillips with his fist, initiating a 'fisticuffs' (a fight with fists) with him. Indeed, he only resorted to his gun, and then hesitatingly, when shots were fired on the other side of the car. Truly, to the degree one can see deliberation and premeditation on the part of Hampton for a killing via a gun, what one sees on the part of Bey is the very absence of such premeditation and deliberation."

In addition, he argues everything happened so quickly that there would not have been time for Bey to ascertain who, as between Hampton and Hayes, had fired the shots on the other side of the car or for Bey to form a purpose or intent before firing his gun.

But, for each of three reasons, we are not persuaded.

First, Bey's argument unduly limits the applicable timeframe. It does so by cutting the analysis off at the moment that Hampton fired the fatal shots. (See *ante*.) But the commission of the murder did not stop at that moment. Instead, it continued until Hayes died. (See *People v. Celis* (2006) 141 Cal.App.4th 466, 474, 471 (*Celis*) ["a person may aid and abet a murder after the fatal blow is struck as long as the aiding and abetting occurs before the victim dies"; rejecting argument "that 'a murder is complete when the fatal blow is struck, even if the victim lingers for a substantial period of time'"]; see also *People v. Gaines* (2023) 93 Cal.App.5th 91, 128, *People v. Fleming* (2018) 27 Cal.App.5th 754, 767.)[12]

Second, the test on a sufficiency-of-the-evidence challenge is not whether substantial evidence supports a finding that the appellant *wishes* had been made at trial, but rather whether such evidence, contradicted or not, supports findings that *actually* were made at trial. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 925.) For this reason, if substantial evidence to

---

[12] Bey states "the law does not provide a clear answer to [the] question" of whether the commission of a murder ends "when the act that caused the death ends" or "when . . . the victim dies," and argues a distinction should be drawn between, on the one hand, "killings caused by a single (solitary) act, such as a shooting, and[, on the other hand,] killings caused by ongoing acts, such as instances of strangulations and beatings—i.e., scenarios where it is difficult to identify the actual murderous act." However, we see no need to draw such a distinction, and are satisfied that *Celis, supra,* 141 Cal.App.4th 466 is dispositive on this point.

20

support a first degree murder conviction appears in the record, then (as noted *ante*) " '*it is of no consequence that the* [jury] *believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' " (*Ortiz, supra*, 208 Cal.App.4th at p. 1363.)

Third, there was substantial evidence to support findings that Hampton deliberated and premeditated about killing Hayes before he fired his gun at Hayes, that Bey knew and shared Hampton's unlawful purpose before or during the commission of the murder, that he (Bey) deliberated and premeditated about killing Hayes before he fired *his* gun at Hayes, and that he likewise deliberated and premeditated about killing Phillips before firing at Phillips. As noted *ante*: " ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ' " ' " (*Gomez, supra,* 6 Cal.5th at p. 282.) The evidence adduced by Bey notwithstanding, the fact remains that *other* evidence supported the inferences needed to convict.

Evidence of this sort encompassed conduct that preceded the encounter with Hayes and Phillips, such as, for example the evidence indicating: that Hampton and Bey arrived together; that they sought a confrontation with strangers who they had reason to believe had disrespected, assaulted, and/or threatened lethal force against a family member, and who they had further reason to believe were armed; and that they themselves came armed with loaded guns. Such evidence also included conduct that occurred during the encounter, such as, for example, evidence supporting an inference that Hampton and Bey acted in concert, separating, isolating, and neutralizing

21

the two victims on opposite sides of the gray car[13] and evidence indicating that they fired within seconds of one another and then drove off and made their escape together.

From such evidence, the jury could reasonably have inferred that Hampton and Bey had deliberated, premeditated, and decided to commit a murder before they arrived at the park. Alternatively, it could reasonably have inferred from such evidence that Bey had discerned Hampton's purpose, deliberated, premeditated, and decided to participate in the killing of Hayes during the short span of time that elapsed between his and Hampton's arrival on the scene and his (Bey's) firing at Hayes. And the jury could also reasonably have inferred from such evidence that Bey had deliberated, premeditated, and decided to kill *Phillips* during the slightly longer span of time that elapsed between his and Hampton's arrival on the scene and his (Bey's) firing at Phillips.

Thus we conclude each of Bey's convictions is supported by substantial evidence.

## B. Alleged Instructional Error

In a further challenge to the judgments, Bey and Hampton each contend, albeit on different grounds, that the trial court erred in the manner in which it instructed the jury.

---

[13] Bey contends the fact that he "instinctively ducked down" when Hampton fired the first shot supports an inference that he was "completely surprised by the shooting." We agree with this contention. However, inasmuch as the report from a gun could startle even a person *expecting* gunfire, the same fact also supports an inference that Bey would have ducked regardless of whether he had expected shooting to occur.

22

### 1. Absence of Attempted Murder Instruction as to Count 1

Bey's contention with respect to instructional error is that the trial court improperly failed to instruct the jury on a lesser included offense for count 1. As to this contention, our review of the record is de novo. (*People v. Souza* (2012) 54 Cal.4th 90, 113 ["On appeal, we review independently . . . whether the trial court improperly failed to instruct on a lesser included offense."].)

The thrust of Bey's argument in support of this contention is: (i) that a trial court has a sua sponte obligation to instruct on a lesser included offense that is supported by substantial evidence, irrespective of whether defense counsel has requested such an instruction; (ii) that attempted murder is a lesser included offense of murder; (iii) that attempted murder was supported by substantial evidence, not just with respect to count 2, but also with respect to count 1; and, therefore, (iv) that, when the trial court instructed the jury on murder as to count 1, it should also have given the jury an instruction on *attempted* murder with respect to that count.

Bey is correct in his first argument. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 215 ["a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present"]; accord *People v. Birks* (1998) 19 Cal.4th 108, 112, *People v. Breverman* (1998) 19 Cal.4th 142, 154-155.) But, as we discuss *post*, he is incorrect in his second argument. That is, he is incorrect in his assertion that attempted murder is a lesser included offense of murder.

In determining whether one offense is a lesser included offense of another offense, courts apply two tests—the statutory elements test (also known as the elements test) and the accusatory pleading test—either of

23

which by itself can suffice to trigger a trial court's duty to instruct on a lesser included offense. (*People v. Perez-Robles* (2023) 95 Cal.App.5th 222, 235.) " 'Under the elements test, an uncharged offense is included in a greater charged offense if the statutory elements of the greater offense include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*Ibid*.) "Under the accusatory pleading test, ' " if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." ' " (*Ibid*.)

But the accusatory pleading test "does not apply where the accusatory pleading does not allege facts specific to the case, but rather states the offense alleged in the language of the statutory definition." (*People v. Eagle* (2016) 246 Cal.App.4th 275, 279 (*Eagle*); accord *People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1247 (*Braslaw*) ["Where the accusatory pleading, as in this case, tracks the statutory language rather than reciting factual details of the offense, 'only the statutory elements test is relevant in determining if an uncharged crime is a lesser included offense of that charged.' "].)

In the present case, count 1 of the information tracked the statutory language of section 187, subdivision (a), and alleged no case-specific facts. (See *ante*.) Thus, "[b]ecause only the statutory language was alleged . . . , we are limited to using the statutory elements test" (*Eagle, supra,* 246 Cal.App.4th at p. 279) to determine whether attempted murder is a lesser offense of murder.

Applying the statutory elements test, we begin with an observation that our Supreme Court shared in *People v. Bailey* (2012) 54 Cal.4th 740. That is, that "the general principle that attempt is a lesser included offense of any completed crime . . . is not applicable . . . where the attempted offense

24

includes a particularized intent that goes beyond what is required by the completed offense." (*Id.* at p. 753.)

"[This observation] highlights a nonintuitive aspect of the relationship between attempts and completed crimes: while it might seem an attempt would naturally be a lesser included offense, this is not necessarily so. Attempts are only lesser included offenses if the sole distinction between the attempt and the completed offense is completion of the act constituting the crime. [Citation.] If the attempt requires a heightened mental state, as is the case with attempts of many general intent crimes, the attempt requires proof of an additional element and is therefore not a lesser included offense." (*Braslaw, supra,* 233 Cal.App.4th at p. 1248.)

As discussed *ante*, murder is the unlawful killing of a human being with malice aforethought, and malice aforethought may be implied *even absent* a specific intent to kill. By contrast (and as also discussed *ante*), *attempted* murder *requires* a specific intent to kill. In other words (tracking the language of *Braslaw, supra*, 233 CalApp.4th at p. 1248), "the attempt requires proof of an additional element"—a specific intent to kill—"and is therefore not a lesser included offense under the elements test." (*Ibid.*) Thus Bey was not entitled to an instruction on it. (See *People v. Jennings* (2010) 50 Cal.4th 616, 668 ["[a] defendant has no right to instructions on lesser *related* [as distinguished from lesser included] offenses, even if he or she requests the instruction and it would have been supported by substantial evidence, because California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties" (italics added)].)[14]

_____

[14] Bey argues that, irrespective of whether he was *entitled* to an instruction on attempted murder for count 1, his attorney's failure to *request*

25

For this reason, we reject Bey's contention that the trial court erred in not instructing the jury on attempted murder with respect to count 1.

## 2. Inclusion of Instruction About Testifying Defendant's Failure to Explain or Deny Adverse Evidence

Whereas Bey contends the trial court did not give an instruction he says it *should* have given, Hampton contends the opposite. That is, he contends the court *did* give an instruction it should have *refrained* from giving. The text of this instruction—CALCRIM No. 361—is as follows:

> "If the defendant failed in (his/her) testimony to explain or deny evidence against (him/her), and if (he/she) could reasonably be expected to have done so based on what (he/she) knew, you may consider (his/her) failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt.

> "If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

A CALCRIM No. 361 instruction " 'applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge.' " (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 606.) "Where a defendant's testimony contradicts or stands in conflict with the state's evidence, such 'contradiction is not a failure to explain or deny.' " (*Ibid.*) "Nor is the instruction appropriate even when a defendant's testimony may seem 'improbable, incredible, unbelievable, or bizarre.' " (*Ibid.*) "As our high court has explained, '[t]he

---

such an instruction for that count deprived him of his right to effective assistance of counsel. But he presents no evidence or argument to suggest the People would have acquiesced to that instruction being given, had it been requested.

instruction acknowledges to the jury the "reasonable inferences that may flow from silence" when the defendant "fail[s] to explain or deny evidence against him" and "the facts are peculiarly within his knowledge." ' [Citation.] Accordingly, the task of the reviewing court in examining a claim that a CALCRIM No. 361-based jury instruction was improperly given is 'to ascertain if [the] defendant . . . failed to explain or deny any fact of evidence that was within the scope of relevant cross-examination' and was 'within [the defendant's] knowledge which he did not explain or deny.' " (*Grandberry,* at p. 606.) The examination of such a claim is de novo. (*Id.* at p. 604.)

In support of his contention that the trial court erred in instructing the jury that it could draw an adverse inference from his failure to deny or explain evidence against him, Hampton argues that there was no evidence at trial that he failed to explain or deny. In addition, he argues that he was prejudiced by the giving of this instruction because this was a "close" case, representing "one of those relatively rare instances where the error probably made a difference," and that "it is reasonably probable that a result more favorable to Hampton would have been reached if the trial court had not damaged his credibility in the eyes of the jury by instructing it with CALCRIM No. 361, effectively torpedoing his defense."

In response, the People argue that Hampton forfeited these arguments because his trial counsel failed to object to the giving of CALCRIM No. 361 and that any error in including CALCRIM No. 361 in the instructions to the jury was rendered harmless in all events by the conditional phraseology of the instruction ("[i]f . . . [i]f . . . you may . . . [i]f"); by the curative effect of other instructions given by the court (CALCRIM Nos. 200 and 220); and by "the overwhelming evidence of Hampton's guilt."

We find it unnecessary to determine whether evidence was adduced at trial that Hampton did not explain or deny, to weigh in on the People's claim of forfeiture, or to parse the phraseology of CALCRIM No. 361 or the curative effect of other instructions, however, because we agree with the People that, even if the trial court had erred in including CALCRIM No. 361 in its instructions to the jury, that error would be rendered harmless by the overwhelming evidence supporting Hampton's guilt. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1471 [applying harmless error standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 to defendant's claim that trial court erred in instructing jury it could draw an adverse inference from defendant's failure to deny or explain evidence against him].)

Indeed, Hampton admitted that he had fired the fatal shots and that he had reflected (i.e., premeditated and deliberated) before doing so, for example, during the period of time in which he raised and lowered his gun as a form of warning to Hayes. The testimony of other witnesses, the forensic evidence, and the Ring doorbell recordings corroborated as much. And, perhaps most damning of all, the Ring doorbell recordings—in which Hayes could be seen with his arms outstretched, in a gesture that appears to have been the *opposite* of menacing, before Hampton fired a fusillade of bullets at him—demolished the cornerstone of Hampton's claim of self-defense. That cornerstone being his testimony that he fired because he felt threatened by the fact (refuted by the Ring doorbell video) that, throughout the encounter, Hayes had concealed his hands in his waistband.

Thus we reject Hampton's contention that trial court erred in instructing the jury on a testifying defendant's failure to explain or deny adverse evidence.

28

**C. Alleged Prosecutorial Misconduct, Racial Justice Act Violation, and Denial of Motion for Mistrial**

As a further basis for challenging the judgment entered against him, Bey contends: that the People elicited inadmissible gang-related evidence; that, by doing so, they violated a court order and engaged in prosecutorial misconduct; that the trial court erred in denying a motion for mistrial based on this conduct; and that this conduct also violated the Racial Justice Act (codified at section 745).

The evidence Bey cites to support these contentions is (1) testimony (discussed *post*) that the prosecutor elicited from two witnesses (English and Sanchez), and attempted to elicit from a third witness (Phillips), to the effect that—immediately before firing his gun at Hayes—Bey shouted: "Tree Top." Also pertinent to these contentions is: (2) testimony (discussed *post*) that the prosecutor elicited from Sanchez pertaining to a different phrase—"tell that though"—and (3) testimony (discussed *ante* and *post*) that Hampton's counsel elicited from Hampton pertaining to the phrase "on the dead homies."

To place Bey's contentions about "Tree Top" in context, it is necessary to introduce additional information about the proceedings below. We present this information chronologically, beginning with a motion in limine that was heard before the jury was sworn.

**1. Additional Information**

**a. Motion to Admit Bey's Gang Affiliation**

The People's motion in limine mentioned in the previous paragraph was titled: "Motion to Admit Rasheed Bey's Gang Affiliation to Prove Motive and Identity under Evidence Code § 1101(b)." In this motion, the People argued Bey was a member of a criminal street gang named "Tree Top Piru"; that during the encounter in Lillian Park he had shouted the gang's name; that it was typical for gang members to identify themselves to their victims

in this manner; and that it was essential for the People to be permitted to adduce evidence to such effect in order to demonstrate that the killing of Hayes and the attempt to kill Phillips were willful, deliberate, and premeditated:

> "[T]he People must prove the defendants' identities and that the defendants acted willfully, deliberately, and with premeditation when they fired multiple shots at two people. After the shooting, Rasheed Bey yells out his gang name, 'Tree Top.' Mr. Bey also admitted to detectives he is from Tree Top Piru and has tattoos showing his membership in the gang. This not only shows that Mr. Bey is one of the shooters in the video, it also shows . . . what is going on inside of Mr. Bey's head at the time of the shooting, which is invaluable information for the jury.

> "The ordinary juror would not know that gang members commonly tell their victims of their gang name during the commission of a crime. Certainly, the Defense will raise some manner of self-defense or provocation argument. The evidence that Mr. Bey is from Tree Top Piru and yelled out his gang name during the murder is necessary to prove willfulness, deliberation, and premeditation, and to also fairly rebut any defense theory."

During the first day of in limine motion hearings, the People elaborated on this motion as follows:

Court: "Tell me how is the intent related to his gang affiliation.

People: "Because let's say the jury just hears it in a vacuum, and they just see the video, and they just hear Tree Top, Tell that, though, no context, okay. The average juror doesn't know . . . what to do with that. [T]hey have no idea—they don't have a machine that can look inside Mr. Bey's head and see his intent. They have to make a decision on intent. [¶] And if someone is shouting out his gang name, you can see what's in their head. [¶] It's, I am going to tell them where I'm from. I'm from Tree Top

30

Piru . . . . That shows what's in his head, and that's admissible . . . . [¶ . . . ¶]

People        "[The defense is] going to argue . . . [that] Mr. Bey . . . didn't see who it was [that was firing a gun on the other side of the gray car and that he] was just firing . . . because he's scared. [¶] I need to be able to fairly rebut that. And . . . the jury needs all that information to fairly decide if he's an aider and abettor. [¶ . . . ¶]

People:       "[The jurors] don't know what it means when someone yells out Tree Top. That's a direct window into his head . . . ."

The court tentatively denied the motion, but invited the prosecutor to furnish additional information when the in limine motion hearing resumed the next day:

Court:        I'm not going to allow gang information. This is a tentative ruling. You can bring me more information if you want to tomorrow morning, but tentatively I'm not allowing it."

When the in limine motion hearing resumed the following morning, the People played the Ring doorbell video and audio for the court and then further argued as follows:

People:       So . . . you see James Hampton shoot Donta Hayes. And you see Mr. Bey back up—yell out Tree Top, back up, pull out his gun. And why do gang members yell out Tree Top? It is not because they are scared. It is not because they are defending themselves. They want it known, I am from Tree Top. This is what is shooting you. And anyone else listening, any other witness, you better not testify because I am from Tree Top. We are going after you if you testify. [¶] And when you hear afterwards, Tell that, though, that's again saying, We are from Tree Top. Tell that to all your friends. We fire at you. [¶ . . . ¶]

31

> People: [What's going on in Mr. Bey's head is] what I have to argue, and I need to be able to argue everything I have, which includes yelling out Tree Top. And that is huge when you're yelling out Tree Top versus yelling out something else, and you're calling out your gang. And I have to prove that he had an intent to kill, and that when he did so, it was premeditated, it was willful and deliberate. [¶ . . . ¶]
>
> People: You get a glimpse of what's going on inside his head. It is not, I am defending myself. It is, I am going to shoot these people, and I am going to let everyone know I am from Tree Top, so that they know where I am from, they know I am dangerous, and they know not to testify if anyone is a witness."

The court then ruled: "I'm standing by my previous decision . . . the gang affiliation won't be permitted to prove motive and identity."

### b. "Tree Top" Testimony Elicited from English

Several days after the trial court denied the in limine motion, the People called English to testify. During his examination of English, the prosecutor played the Ring doorbell video, without audio. Then he decided to add the audio; and, when he previewed this intention to the court and opposing counsel (outside the presence of the jury), the following exchange ensued:

> People: So far I have been playing the audio with Mr. English. I want to not publish for the jury but bring up my laptop with the audio of the shooting video and see if he can identify who said what in there . . . . [H]e's already [been] admonished by our victim advocate not to mention gang. I just want to give a heads up [of] what's coming." [¶ . . . ¶]
>
> Court: You can ask him if he heard what people were saying without playing that video. Ask him if he

32

heard different characters yelling or talking on the audio without playing the video.

People: So one of the things I'll say is, someone yells out Tree Top, and tell that, though. I'm not going to mention gang. It's just—

Court: How about first you ask him if he heard anyone yell out.

People: I do know because [he said so] in his interview [by Detective Sanchez] last year.

Court: You have it in testimony. Ask him if he heard anyone yell out and what he heard them yell out. [¶ . . . ¶]

Court: We're not playing the audio."[15]

Following this exchange, the prosecutor started down the path the court had instructed him to follow, but the response he elicited was negative:

Q. "When the shooting is happening, did you hear— could you hear anyone shout out anything?

A. "No."

At this juncture the prosecutor shifted gears, and asked English whether he recalled having told Sanchez that he had heard someone shout: "Tree Top":

Q. "Do you recall . . . your interview with Detective Sanchez last year, that was about a day or two after the shooting?

A. "Uh-huh.

---

[15] It is not clear why the court precluded the prosecutor from playing the audio at this juncture. Later the same day, during the direct examination of Phillips, the court permitted the prosecutor to play the audio. (See *post*.)

> Q. "Do you recall telling Detective Sanchez—just a yes or no. Do you recall telling Detective Sanchez someone yelling out Tree Top?
>
> A. "Yes.
>
> Q. "And were you able to tell who said that?
>
> A. "Yes."

English then proceeded to identify Bey as the individual who had yelled "Tree Top."

A short while later, the prosecutor again asked English about "Tree Top":

> Q. "You mentioned . . . [that] a couple days . . . after the shooting you had an interview with Detective Sanchez?
>
> A. "Yes, sir.
>
> Q. "And you told Detective Sanchez the guy hollered Tree Top; is that correct, sir?
>
> A. "Yes, sir."

Bey's counsel did not object during these exchanges.

### c. Transcripts of the Ring Doorbell Audio

After English had completed his testimony, the People called Phillips as their next witness. During his direct examination of Phillips, the prosecutor informed the court that he intended to play the Ring doorbell video and audio and that he wished to distribute transcripts of the audio to jurors.

Bey's counsel did not object to the transcripts. Instead he requested a sidebar, in which the following colloquy occurred:

> "[Bey's Counsel]: We just need the admonishment regarding audio and transcripts. . . The evidence is what's on the audio, not what's in the transcript.
>
> Court: Okay.

34

People:  That's fine."

Thereafter, the transcripts were distributed to jurors without objection, and the court admonished the jury:

> "Ladies and gentlemen of the jury, you have been given a transcript.  The transcript itself is not evidence.  The evidence is the video and what you hear on the video.  ¶ When you go back to deliberate, you will not be given the transcript[s].  They are not evidence.  They are here only to assist you, but the evidence is the actual video and audio and the answers that the witnesses give."

In one of the transcripts was a passage that, in two locations, included the phrase "dead homies" and attributed the utterance of this phrase to Phillips.  In the other transcript was a passage that included the phrases "Tree Top" and "tell that though" and attributed the utterance of *those* phrases to Bey:

> Voices:    "Watch out, watch out.  (Overlapping voices) Watch out, watch out.
>
> Phillips:   "I didn't disrespect you.  [unintelligible] a kid fight bro.
>
> Bey:       "Get over here.  [Gunshots.]  Tree Top. [Gunshots].  Hoe ass nigga.  Tell that though. Freeway."

### d.    "Tree Top" Testimony Elicited from Phillips

After the prosecutor played the Ring doorbell video and audio, he asked Phillips without objection about "Tree Top":

> Q.    "In that video that we just watched did you hear someone yell Tree Top, just a yes or no?
>
> A.    "I don't remember."

Then the prosecutor moved on.

### e. Bey's Motion for a Mistrial Based on "Tree Top"

Not long after the prosecutor had asked Phillips about "Tree Top," Bey's counsel moved for a mistrial, but the trial court summarily denied the motion in the following exchange:

Counsel: "I am making a motion for a mistrial, given the testimony of both Mr. Phillips and Mr. English. I don't know why, but [the prosecutor] persisted in asking, did you hear him say Tree Top? Did he say Tree Top? Did you hear somebody yell out Tree Top? After the Court made an order about gang evidence.

"And he . . . seemingly just insisted on asking about that for no particular issue, other than getting it out there that they heard somebody yell out Tree Top.

"My expectation is that [the prosecutor] will say, Well, I didn't say anything about a gang, but then also hope that a juror knows what that means or knows what that's about.

"There was no evidentiary value with witness Phillips or English to say, to specifically target in on that numerous times and say, Did you hear him say a Tree Top? Did you hear him yell Tree Top? I think it's just, again, another bootstrap end around to get around the Court's ruling to stay away from gang, to get the witnesses to say they heard it, and then hope that one of those jurors knows or has an idea what that means. [¶ . . . ¶]

People: "Your Honor, mistrials need to be based on clear violations of an order of law, not speculation[s] . . . . [¶] I am going to continue to try and prove my case, because there are certain elements I need to prove, to prove who said that. And . . . I followed all the Court's orders to make sure no one talks about gang. And there's nothing explicit about Tree Top being a gang. [¶ . . . ¶]

Court: "Motion for mistrial is denied."

36

### f.  "Tell That Though" Testimony Elicited from Detective Sanchez

Several days after Phillips finished testifying, Detective Sanchez testified.  During his direct examination, after having acknowledged that he had viewed and listened to the Ring doorbell audio and video, Sanchez was asked if he had heard certain words or phrases on the audio.  Among the words and phrases as to which he was queried was "tell that though"; and, in the absence of an objection, Detective Sanchez testified about this phrase as follows:

> Q. "Did you hear, 'Tell that though' [on the Ring doorbell audio]?
>
> A. "Yes, sir.
>
> Q. "Based on your experience as a police officer in Barstow, is it important to pick up on slang that people use?
>
> A. "Yes, sir.
>
> Q. "Are you familiar with the phrase, 'Tell that though'?
>
> A. "Yes.
>
> Q. "And can you please explain what this slang phrase means?
>
> A. "The phrase 'Tell that though' means—it's basically somebody, whoever they're telling that to, whoever they're telling 'Tell that though,' they're basically telling that person to go back to their people or wherever they're from and inform them about what just happened, as an example of, you know, Hey, if you mess with me, this is what is going to happen to you."
>
> Q. During your investigation, . . . you spoke with Allison Hampton?
>
> A. Yes.

37

> Q.    James Hampton?
>
> A.    Yes.
>
> Q.    Rasheed Bey?
>
> A.    Yes.
>
> Q.    Delmar Phillips?
>
> A.    Yes.
>
> Q.    And based on your conversations with all of those parties, do you have an opinion . . . [as to] who yelled out . . . 'Tell that though' [in the Ring doorbell audio]?
>
> A    Yes, I do.
>
> Q.    And who is that?
>
> A.    I believe that was Rasheed Bey."

Immediately after this testimony, the prosecutor requested a sidebar and, outside the presence of the jury, expressed to the court his intention to ask Detective Sanchez about "Tree Top." He stated that his purpose for doing so was to distinguish Bey's voice from other voices and to demonstrate that the individual who had said "tell that though" was the same person who had said "Tree Top." In support of his position, the prosecutor said, "we don't have to talk about gangs, just the 'Tree Top.' " Bey's counsel objected on much the same grounds he had raised when making the motion for a mistrial discussed *ante*. Sustaining the objection, the court told the prosecutor: "you can't bring up . . . 'Tree Top' " with Detective Sanchez.

### g.    Motion for a Mistrial Based on "Tell That Though"

After Detective Sanchez had completed his testimony, Bey's counsel moved for a mistrial based on the testimony the prosecutor had elicited from him relating to "tell that though," but the trial court summarily denied the motion:

Counsel:   [The] . . . request for a mistrial [is] based upon the Court's in lim[ine] ruling regarding mention of gang. [¶] During the detective's testimony on direct, when he was talking about the statement of . . . 'Go tell that though,' he made reference to that being slang for people to go back to—he mentioned a few different terms, but they would be gang-related terms, 'Back to their hood' or 'Back to their people.' [That's a] strong inference of gang affiliation . . . . [¶ . . . ¶]

People:   "[A]gain, you can't get a mistrial based on speculation.

Court:   "The mistrial requests are denied."

### h.   Discussions Relating to Defendants' Decisionmaking About Whether to Testify

The next witness to testify after Sanchez was Hampton. Shortly before Hampton took the witness stand, the trial court engaged in a discussion with counsel regarding the implications of either of the defendants testifying. As part of this discussion, the court indicated that, if Bey were to testify, he could be asked about whether he had yelled "Tree Top" and about gang evidence with regard to "Tree Top":

Court:   "If Mr. Bey . . . chooses to testify, then anything that can be attributed to him being said on the tapes is fair game, including the belief that it is Mr. Bey that yelled out Tree Top. [¶ . . . ¶]

Court:   "He can be asked regarding that, if he chooses to testify.

People:   "As well as the gang evidence, your Honor.

Court:   "With regard to Tree Top?

People:   "Yes.

Court:   "With regard to Tree Top, yes."

39

### i. Argument About the Implications of Hampton's "On the Dead Homies" Testimony

Bey elected not to testify. But, as noted *ante*, Hampton did testify. After Hampton had completed his direct examination, the prosecutor argued "the door [had been] opened for [testimony about] gangs." To support this argument, he cited the testimony (see *ante*) in which Hampton had said that, as he and Bey were pulling up next to Hayes and Phillips, he heard someone say "on their dead homies" and that this phrase was a "type of slang [he had heard] all [his] life . . . from family members who [were] involved in gangs."

Hampton's counsel resisted the People's argument. So doing, he said:

> "This is something that [the prosecutor] has been trying to do from the very beginning of this entire case.

> "He's been trying to get in gang information. He's painted Mr. Bey out to be a gang member. He is trying to make my client a gang member . . . . [¶ . . . ¶]

> "The problem is that this is not a gang case . . . . [The prosecutor] is simply trying to find another way, another conduit to try to bring it in to suggest that because there might be some sort of fictional thing about gangs in here, to try . . . to inflame the jury in order to get them to convict."

Noting that the phrases "on the dead homies" and "Tree Top" could both be heard in the audio, the court ruled that this fact and Hampton's mention of gangs in his testimony about "on the dead homies" did not suffice to open the door and, thus, gang evidence would not be allowed:

> Court: I don't think it was enough to open the door for all the gang information . . . . [T]he only statement that was made was that he heard someone say, on the dead homies. And that he's heard that type of slang in his life, and it—he did say involving gangs.

> People: "Yes.

Court: But I don't think that by itself is enough to open the door to all the gang information. [¶ . . . ¶]

Court: "[The statement about dead homies] is in the video, but so is the Tree Top statement in the video. [¶ . . . ¶]

Court: "[N]obody is going to be arguing that statement or gang in their closing arguments. I am still not going to allow any gang information at this point in time."

## 2. Analysis

As discussed *ante*, Bey contends (i) the prosecutor engaged in misconduct by eliciting testimony about "Tree Top," (ii) the trial court should have granted his motion for a mistrial based on that alleged misconduct, and (iii) that same alleged misconduct violated the Racial Justice Act.

### a. Alleged Prosecutorial Misconduct and Allegation that Trial Court Abused Its Discretion in Denying Motion for a Mistral

Each of the three contentions enumerated in the preceding paragraph is predicated on Bey's claim that the questioning and testimony about "Tree Top" was prejudicial, inadmissible gang-related evidence elicited in violation of the court's in limine ruling. But, for a variety of reasons, we are not persuaded this claim is correct.

To begin with, the jurors heard for themselves, repeatedly and without objection, the audio captured on the Ring doorbell audio. Thus, they heard the words that Hampton described as "dead homies" and impliedly attributed to Phillips, Hayes, or Astro. Likewise, they heard the words that Sanchez described as "tell that though" and attributed to Bey, and the words that English described as "Tree Top" and likewise attributed to Bey. The record includes no indication that defense counsel ever sought to have any aspect of the audio containing this language redacted.

41

Moreover, the jurors did not just hear the words captured in the audio, they also *saw* the rendition of those words set forth in the transcripts that were distributed to them. The transcripts not only presented the words in print, but also ascribed them to specific speakers—i.e., to Phillips ("dead homies") and to Bey ("Tree Top," "tell that though"). The record includes no indication that defense counsel sought to have any of these words or attributions removed, modified, or redacted, or that he sought to have any of them ascribed to the generic "Voices," as was done with certain other words appearing in the transcripts.

In addition, while it is evident that the prosecutor was aggressive in his efforts to link Bey to the utterance of "Tree Top" and that a chief motivation for him in doing so was to pave the way for eliciting evidence of that phrase's gang significance with a view toward establishing the elements of deliberation and premeditation, it also is evident that this was not his only justification for eliciting "Tree Top" testimony. As the People point out: "The prosecutor . . . used the reference [to 'Tree Top'] to establish that [English] was a percipient witness and heard what was happening during the shooting and was not at the back of his home [and thus unable to perceive what was happening in the street] as suggested by the defense. No matter its meaning, Tree Top is a memorably odd thing to yell out and the fact [that English] heard this [lent] to his credibility as a percipient witness." Moreover, the fact that Bey was verbally communicating anything at all in the midst of all the gunfire is a matter from which the jury might reasonably have drawn inferences about his frame of mind at the time of the shootings, including whether (as he argues on appeal) he was acting instinctively and impulsively, rather than deliberately, when he drew his gun and fired it at Hayes and Phillips.

42

Further, it is speculation to conclude that the jury would have associated "Tree Top" with gang affiliation, or that it would otherwise have invested that phrase with any significance beyond its ordinary meaning. There is a sea of difference between, on the one hand, evidence that Bey uttered this odd phrase and, on the other hand, evidence that the phrase is the name of a gang and that gang members customarily yell out their gang's name when committing acts of violence, to intimidate victims and witnesses.

The court's articulation of its rulings on the in limine motion ("I'm not going to allow gang information" and "the gang affiliation won't be permitted to prove motive and identity"[16]) is eminently susceptible of an interpretation that would bar evidence that "Tree Top" was a gang, that Bey was a member of the gang, and that shouting out "Tree Top" was the functional equivalent of making a threat—yet not bar evidence to the effect of "did you hear someone say 'Tree Top' " and, if so, "who was it?" It is evident from the conduct of the prosecutor that this is how he interpreted the ruling. Thus, for example, in opposing the motion for a mistrial based on "Tree Top," he argued: "I followed all the Court's orders to make sure no one talks about gang. And there's nothing explicit about Tree Top being a gang." So, too, does it appear that this is how the court itself interpreted its ruling. Indeed, not only did it deny the motion for a mistrial based on "Tree Top" immediately after the prosecutor made the statement just quoted; it also

---

16    Neither of these articulations of what the court was excluding—"gang *information*" or "gang *affiliation* . . . to prove motive and intent"—is entirely free of ambiguity. But, as discussed *ante* and *post*, each can readily be squared with an interpretation that would permit the People to elicit testimony as to whether the words "Tree Top" were uttered and, if so, when and by whom. As a consequence it was incumbent on Bey's counsel to seek clarity if he wanted the court to exclude any reference to "Tree Top."

said, after *all* the "Tree Top" testimony had been elicited: "I am still not going to allow any gang information at this point in time."

Finally, aggressive though he was in his efforts to link Bey to the utterance of "Tree Top," the prosecutor nonetheless appears to have strived to hew to the court's order—for example, by arranging in advance for at least one witness (English) to be instructed to refrain from referring to gangs ("he's . . . [been] admonished by our victim advocate not to mention gang"), by cautioning two other witnesses (English and Phillips) to answer with "just a yes or no" when being questioning about "Tree Top," and by alerting the court thereafter when he intended to venture into or beyond testimony about "Tree Top."

Based on the observations set forth above, we conclude no inadmissible evidence of gang affiliation was presented to the jury. The court created a line, and the People did not cross it. The prosecutor did not ask any witness about the meaning of "Tree Top." Nor did he otherwise elicit evidence linking Bey to a gang or illuminating gang culture. If the defense thought "Tree Top" alone sufficed as a reference to gang affiliation, then they forfeited this argument by failing to ask for the pertinent portion of the audio to be silenced or masked, by failing to ask for the corresponding text of the transcript to be removed or modified or redacted, and by failing to timely object during the examinations of English and Phillips.

As a result of the foregoing, we conclude the prosecutor's behavior was not deceptive, reprehensible, or egregious and, therefore, that prosecutorial misconduct did not occur. (See *People v. Caro* (2019) 7 Cal.5th 463, 510 ["Under California law, to establish reversible prosecutorial misconduct a defendant must show that the prosecutor used ' "deceptive or reprehensible methods" ' and that it is reasonably probable that, without such misconduct,

44

an outcome more favorable to the defendant would have resulted. [Citation.] A prosecutor's misconduct violates the federal Constitution if the behavior is ' " ' " ' " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' " ' " ' "].) We likewise conclude no abuse of the trial court's discretion occurred. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 985–986 ["A motion for mistrial is directed to the sound discretion of the trial court. . . . Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion."]; accord *People v. Schultz* (2020) 10 Cal.5th 623, 673; *People v. Flores* (2020) 9 Cal.5th 371, 409.)

### b. Alleged Racial Justice Act Violation

Turning to Bey's contention that the prosecutor's behavior violated the Racial Justice Act (RJA), we begin with the observation that this claim was not raised in the trial court. As several courts of appeal have now held, where a defendant could have raised a Racial Justice Act claim below but failed to do so, the claim is forfeited. (See, e.g., *People v. Midell* (2025) 113 Cal.App.5th 1060, 1075–1076 [First District]; *People v. Corbi* (2024) 106 Cal.App.5th 25, 38–43 (*Corbi*) [Fourth District]; *People v. Singh* (2024) 103 Cal.App.5th 76, 112-117 (*Singh*) [Fifth District]; *People v. Lashon* (2024) 98 Cal.App.5th 804, 810-816 (*Lashon*) [First District].

Bey acknowledges the holdings in two of these opinions (*Singh* and *Lashon*), but contends the opinions were wrongly decided. In support of this contention, he argues that "the right to a trial free from racial bias is a substantial and important right" and that forfeiture is inconsistent with the Legislature's express intent to vindicate that right.[17] But these are

---

17   Bey observes that, in arriving at their conclusion that an RJA claim could be *forfeited* by a failure to raise it at trial, the courts in *Singh* and

arguments that have already been carefully and cogently considered in the afore-cited opinions and determined, in those opinions, to yield to the principles of forfeiture. (See, e.g., *Lashon, supra,* 98 Cal.App.5th at p. 812 [holding an RJA claim, "like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court"]; *Corbi, supra,* 106 Cal.App.5th 25, 43 ["the Legislature intended 'to ensure RJA claims are processed more efficiently' "; agreeing with *Singh, supra,* 103 Cal.App.5th at p. 115, that " '[p]ermitting an [RJA] claim to be raised on direct appeal for the first time when it could have been timely raised and remedied below would be directly contrary to the goal of promoting judicial efficiency.' "].) For this reason, we conclude Bey forfeited his contention that the People violated his rights under the RJA.

## D.    Sentencing

As a final basis for challenging the judgments against them, Hampton and Bey contend the trial court applied an incorrect legal standard when it

---

*Lashon* relied in part on a provision of the RJA that dealt with the concept of *waiver*; and waiver, he points out, "is not the same as forfeiture." These observations are correct. But they do not avail Bey. For, as explained in *Singh*: The referenced provision states that, if a motion alleging a violation of the RJA is not "made as soon as practicable upon the defendant learning of the alleged violation," the motion "*may be deemed waived,* in the discretion of the [trial] court" (*Singh, supra,* 103 Cal.App.5th at p. 115, fn. 2, quoting and adding italics to § 745, subd. (c)) without the trial court being obliged to inquire into whether there was an intelligent and voluntary relinquishment of a known right. This being the case, "[t]o permit a defendant to raise a claim on direct appeal where, as here, he could have but failed to timely raise it at trial would render the timeliness requirement set forth in section 745, subdivision (c) meaningless because, even if such a claim was not timely raised below, it could be raised for the first time on appeal." (*Singh,* at p. 115.)

denied motions they had filed pursuant to section 1385, subdivision (c), to dismiss or strike the jury's firearm findings[18] (the firearm enhancements).

### 1. Section 1385, Subdivision (c)

Section 1385, subdivision (c), states that, "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) It then goes on to provide that: "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of [several individually enumerated] . . . mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, *unless the court finds that dismissal of the enhancement would endanger public safety*. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (§ 1385, subd. (c)(2), italics added.)

In *People v. Gonzalez* (2024) 103 Cal.App.5th 215, 221 (*Gonzalez*), a panel of this court concluded that the plain language of section 1385, subdivision (c)(2), requires a trial court to consider not only (i) whether the

---

18      As discussed *ante*, the jury found that each defendant had personally used and discharged a firearm in the murder of Hayes, that Hampton's discharge of a firearm had caused Hayes's death, and that Bey had personally used and discharged a firearm in the commission of the attempted murder of Phillips. On a verdict of murder or attempted murder, the amount of time such firearm enhancements add to a sentence is 10 years for "personally *us*[ing] a firearm," 20 years for "personally and intentionally *discharg*[ing] a firearm," and 25 years to life for "personally and intentionally discharg[ing] a firearm and *proximately caus*[ing] . . . *death* . . . to a person other than an accomplice." (§ 12022.53, subds. (a)(1), (18), (b), (c), and (d), italics added.)

47

defendant currently poses a risk to public safety, but also (ii) the danger as of the date the defendant might be released if a given enhancement were struck and (iii) whether any such release would be reviewable by the Board of Parole Hearings or the Governor. (*Gonzalez, supra,* 103 Cal.App.5th at pp. 230–231.)[19]

## 2. The Trial Court's Findings Pursuant to Section 1385, Subdivision (c); and the Components of the Sentences It Imposed

In denying Hampton and Bey's motions to dismiss or strike firearm enhancements, the trial court implicitly invoked section 1385, subdivision (c), by finding "there is a high likelihood that[,] if not in prison, [Hampton] will

---

[19] The *Gonzalez* court explained, "section 1385, subdivision (c)(2) focuses on the danger associated with the dismissal of an enhancement, phrasing the inquiry as whether 'dismissal of the enhancement would endanger public safety,' and whether 'there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' (§ 1385, subd. (c)(2).) Although the current dangerousness of the defendant is an appropriate factor to consider, as it will have some bearing on whether dismissing the enhancement would endanger the public, a crucial part of the inquiry is how the dismissal of the enhancement will impact the length of the defendant's sentence. A currently dangerous defendant who will be released from prison within a short time frame might be found by the trial court to pose a greater danger to the public than a defendant who is currently dangerous but who has no prospect of release from prison until he is elderly." (*Gonzalez, supra,* 103 Cal.App.5th at p. 228, italics omitted.)

"Further, an inquiry into whether public safety will be endangered by the dismissal of an enhancement for a defendant serving a lengthy indeterminate sentence should also take into account that the defendant's release from prison is contingent on review by the Board of Parole Hearings (and for murder convictions, by the Governor), who will have the opportunity to assess the defendant's dangerousness at that time." (*Gonzalez, supra,* 103 Cal.App.5th at p. 228.)

be a danger to others" and that Bey, "if not imprisoned, . . . would be a high likelihood to be a danger to others."[20]

So finding, the court proceeded to sentence Hampton, on count 1, to a term of imprisonment of 25 years to life for the murder of Hayes, to be followed by a further 25 years to life for discharging a firearm causing death during the commission of that offense, for a total of 50 years to life.

Thereafter, the court sentenced Bey. On count 1, it imposed a term of imprisonment of 25 years to life for the murder of Hayes, to be followed by a further 20 years for discharging a firearm during the commission of that offense, for a total of 45 years to life on that count. On count 2, the court imposed a term of imprisonment of 7 years for the attempted murder of Phillips, to be followed by a further 20 years for discharging a firearm during the commission of *that* offense, for a total of 32 years to life on that count. All told, this amounted to a term of imprisonment for Bey of 72 years to life, consisting of 32 years to life for the murder and attempted murder plus a further 40 years for the firearm enhancements.

### 3. Analysis

As noted *ante*, the defendants' contention with regard to sentencing is that the trial court applied an improper legal standard when it denied their motions to dismiss or strike the firearm enhancements. Specifically, they contend the court's phraseology—i.e., its statements that "there is a high likelihood that[,] if not in prison, [Hampton] will be a danger to others" and that Bey, "if not imprisoned, . . . would be a high likelihood to be a danger to others"—reveals that the court impermissibly focused only on the danger each defendant posed *at the time of sentencing,* when it should instead or also

---

20    As to each defendant, the court also found that aggravating factors outweighed mitigating factors.

have focused on whatever danger he would pose if released at the conclusion of his sentence on the underlying offense(s).

In assessing this contention, we apply an abuse of discretion standard of review. (*Gonzalez, supra,* Cal.App.5th at p. 225 [" 'an abuse of discretion arises if the trial court based its decision on impermissible factors . . . or on an incorrect legal standard' "].) However, we do not presume error on appeal. Instead an appellant must "affirmatively demonstrate that the trial court misunderstood its sentencing discretion" (*People v. Davis* (1996) 50 Cal.App.4th 168, 172 (*Davis*); see also *People v. Coleman* (2024) 98 Cal.App.5th 709, 725 (*Coleman*) ["citation to a silent record is insufficient to meet [an appellant's] burden to demonstrate an abuse of discretion"])—and here is where Hampton and Bey's challenges to their sentences fall short.

In *Gonzalez* the appellant presented statements the trial court had made during sentencing that demonstrated the court had impermissibly premised its danger to public safety finding exclusively on circumstances existing at the time of sentencing, rather than considering circumstances as they might be at the conclusion of his sentence:

> "I'm not sure that when I'm sentencing and finding someone is a danger that I have to consider . . . [that] it's going to be 75 years before he's out, so in 75 years he's not going to be a danger. [¶] Isn't it . . . does he currently at the time of sentencing represent a danger to society? That's how I read the law. [¶ . . . ¶] "[A]s I said before, I think presently he does represent a danger to society, and for that reason . . . I . . . think it is appropriate for the Court to impose an additional 25 years to life for the gun use enhancement . . . ." (*Gonzalez, supra,* 103 Cal.App.5th at pp. 223−224 [concluding the passage from which the quoted statements are drawn demonstrated that "[t]he trial court . . . declined to exercise its discretion to dismiss the 25-year-to-life firearm enhancement based on its finding

50

that Gonzalez '*presently* . . . represent[s] a danger to society;' " italics added].)

These statements from *Gonzalez* "*affirmatively demonstrate[d]* that the trial court [in that case] misunderstood its sentencing discretion." (*Davis, supra,* 50 Cal.App.4th at p. 172, italics added.) By contrast, Hampton and Bey merely *conjecture* that, when the trial court found a "high likelihood" of "danger to others" if Hampton or Bey were to be released, it was focusing on the (then) present rather than the future. On a premise as thin as this we cannot find error. (*Ibid.*; *Coleman, supra,* 98 Cal.App.5th at p. 725.)

Here, Hampton and Bey sought a confrontation and arrived armed. One of them repeatedly shot a victim at close range, including as he struggled on the ground, and killed him. The other repeatedly shot at that same victim and a second victim, even as each victim was running away from him. Under the applicable statutory framework, the trial court was required to decide, at the time of sentencing, whether a lesser sentence would endanger public safety. Considering the available information, the court concluded imposition of a lesser sentence would endanger public safety. Neither Hampton nor Bey has met his burden to establish the trial court's ruling was an abuse of discretion.

## III.    DISPOSITION

The judgments are affirmed.

KELETY, J.

WE CONCUR:


DO, Acting P. J.


BUCHANAN, J.

51